Michael HENDERSON, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–1355.

District of Columbia Court of Appeals.

Argued May 12, 1993.

Decided Oct. 21, 1993.

---

Laura L. Rose, Public Defender Service, with whom James Klein and Jo–Ann Wallace, Public Defender Service, were on the brief, for appellant.

Steven D. Mellin, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., at the time the brief was filed, and John R. Fisher and G. Paul Howes, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and STEADMAN and SULLIVAN, Associate Judges.

ROGERS, Chief Judge:

Appellant, Michael Henderson, appeals from his conviction by a jury of second-degree murder while armed, D.C.Code §§ 22–2403, 22–3202 (Repl.1989 & Supp. 1993), on the ground that under the rule of completeness the trial judge erred by permitting the government to introduce a small portion of the audiotaped statement that appellant gave to the police after his arrest while precluding the defense from introducing additional portions. Appellant also contends that his conviction must be reversed because the prosecutor improperly argued to the jury that appellant's consultation with counsel and subsequent failure to explain to his friends where he was on the night of the murder demonstrated guilt. In light of the government's theory at trial, these claims of error are related. We hold that the trial judge erred in excluding omitted portions of appellant's statement. We further hold that the resulting prejudice was compounded by the error that occurred when the prosecutor argued to the jury that appellant's failure, after consultation with counsel, to explain where he was on the night of the murder demonstrated guilt. Accordingly, we reverse and remand for a new trial.

**I.**

Because there were no witnesses to the murder and the physical evidence was inconclusive, the government's case against appellant, who was indicted for first-degree murder while armed, was based on circumstantial evidence. The government emphasized the relationships between appellant and the decedent, Cheryl Ashton Henderson, his estranged wife, and appellant and his roommates. The government's theory was that appellant had murdered Cheryl Henderson after he had picked her up from work on the night of June 23, 1987, and that his motive was either unrequited love or the hope of collecting $20,000 from her life insurance policy.

The government's evidence established that appellant, Cheryl Henderson, and many of the witnesses had known each other for years, and many were related, as they were all from Montross, Virginia. Appellant and Cheryl Henderson had married in 1985, but they separated when Cheryl Henderson left appellant at the end of 1986, moving from Montross to the District of Columbia. Shortly thereafter, appellant moved to the District, where he secured construction work and lived in an apartment with his uncle and his work supervisor. In the meantime, Cheryl Henderson was living with her boyfriend, Ronnie Bankhead, and his mother. Appellant and his wife saw each other occasionally, and once attempted a brief reconciliation.

On the day of her murder, June 23, 1987, Cheryl Henderson signed into work at 4:00 p.m. for her usual four-to-midnight shift. She was last seen by her supervisor at 7:45 p.m. when she left for her usual 8:00 to 9:00 p.m. dinner break.[1] The next morning, June 24, 1987, Cheryl Henderson's body was discovered at the bottom of a hill behind a church. According to the medical examiner, she bled to death as a result of multiple (45 to 48) stab wounds; phencyclidine (PCP) was found in her system. Two ten-year-old girls

---

1. According to Ronnie Bankhead, who was also from Montross and related to appellant's roommate and work supervisor Charles Tate, Cheryl Henderson had called him around 7:30 p.m. to cancel their usual dinner plans, explaining that there was to be a meeting at work. Bankhead testified that he then drove around until approximately 10:45 p.m., when he went to pick up Cheryl Henderson at work. He claimed that around 11:00 p.m., the office security guard had recognized his car and informed him that Cheryl

Henderson had not returned from her dinner break. Bankhead drove home and when he discovered that she was not there, he went to appellant's apartment house, thinking that Cheryl Henderson might have gone there in hope of obtaining a tax refund that she and appellant were to receive. Bankhead stated that he listened at the door of appellant's apartment, but he left when he did not hear Cheryl Henderson's voice. At trial, defense counsel intimated that Bankhead had killed Cheryl Henderson.

had heard a woman scream on the hill behind the church around 10 p.m. on June 23. On June 24, the police went to appellant's apartment and spoke with his uncle, Glenn Henderson. A detective examined appellant's car for physical evidence but found nothing incriminating except, possibly, a car that looked as if it had been recently cleaned.

The only physical evidence possibly tying appellant to Cheryl Henderson's murder was a purple hat that was recovered approximately twenty-five feet from her body.[2] An expert witness testified that two hairs recovered from the hat were indistinguishable from hairs that were taken from a known sample of appellant's hair, and that none of the hairs removed from the hat could have come from Cheryl Henderson. Several witnesses testified that appellant wore a similar hat with a particular yellow sweatsuit, although each witness who remembered seeing appellant in a hat on the day of Cheryl Henderson's murder testified that appellant had been wearing a black Adidas cap.[3]

The government also presented evidence of appellant's activities on June 23 and 24 in order to show his consciousness of guilt. During June 1987, appellant was living with Charles Tate (his work supervisor) and Glenn Henderson (his uncle) in Oxon Hill, Maryland. On the day of the murder, appellant did not report to work, later explaining to Charles Tate that he was unable to make it to work because the oil light in his car had gone on. Appellant's uncle Glenn was at the apartment from approximately 3 p.m. to 6 p.m., and appellant told him during that time that he had planned to take his car to the shop that day to be fixed. When Glenn returned to the apartment around 7:45 p.m., appellant was not in the apartment and his car was not where he usually parked it.[4]

The next time appellant was placed in the apartment was around 10:45 p.m., June 23.[5] At 4:30 a.m. June 24, Charles Tate woke appellant for work, and appellant asked for a ride to work. Tate mentioned that he would be driving to Montross after work and appellant agreed to ride with him. According to Charles Tate, appellant slept during the rides to work and Montross, claiming that he had had a "rough night" the night before.

The two men arrived in Montross around 4:45 p.m. on June 24.[6] According to Charles Tate, Allen Henderson, appellant's father, said to his son, "you know, you're going to be the prime suspect.... Where were you last night?" Tate testified that appellant responded that he had been at home, which Tate immediately disputed (although conceding that no time frame was mentioned). Appellant then stated that he had been out "messing around." Concerned that his son might be a suspect, Allen Henderson took appellant to see an attorney named Lynn Brownley.[7]

2. Cheryl Henderson's red pocketbook was recovered the morning after her death in an office parking lot on Oxon Hill Road, close to appellant's apartment.

3. No murder weapon was recovered. There was evidence that appellant's roommates discovered in June of 1987 that a butcher knife was missing from the kitchen.

4. According to Charles Tate, appellant left the apartment just before 8:00 p.m. without eating dinner. Kendall Ashton, another friend and a cousin of Cheryl Henderson's from Montross, testified that when he arrived at appellant's apartment at 7:30 p.m. to give appellant a scheduled haircut, he was not there. Charles Tate testified that when he went to bed at around 10:00 p.m. appellant had not yet returned home.

5. At that time, appellant woke Glenn Henderson from his sleep and told him that Ronnie Bankhead was outside the apartment and to call the police if he tried to come in. Glenn saw Bankhead, who left shortly thereafter, in the parking lot.

6. As they waited to get gas, appellant's father, Allen Henderson, and Larry Thomas came up to them. Mr. Henderson asked appellant if he had heard about Cheryl Henderson's murder the night before; appellant said he had not. According to Charles Tate, appellant appeared to be in shock. From the shop where his father worked, appellant called his uncle Glenn, and asked if the police were at the apartment.

7. In addition, two witnesses from Montross testified regarding incriminating statements that appellant had allegedly made on June 24. Calvin Payne testified that around 6:00 p.m. that night he saw appellant pull up to a Fast Mart in his father's car and get out, and he heard appellant mumbling to himself while he made stabbing gestures: "I wonder what the Bankhead is going to do now.... The bitch is on ice ... The bitch is on ice. I wonder what Bankhead is going to

The government also offered evidence that appellant had taken out a $20,000 life insurance policy on his wife shortly before they separated and that he had signed her name to the policy.[8]

Finally, the jury heard portions of an audiotaped statement that appellant had given to the police after he was arrested. In one portion of the statement heard by the jury appellant told the police (in the presence of an Assistant United States Attorney and defense counsel) that during the evening of June 23 he had been talking to Carla Boykin and her brother. The government called Carla Boykin as a witness and she denied that she had ever had a personal, lengthy conversation with appellant at any time, although she admitted knowing appellant and visiting appellant's uncle, Glenn Henderson, at the apartment where appellant lived. On cross-examination she also admitted that she did not remember what she was doing on June 23, 1987. The jury also heard other portions of appellant's audiotaped statement where he stated that he had last seen Cheryl Henderson in Montross on the weekend before she was murdered and that he personally had not filed an income tax return for 1986.

Appellant presented several witnesses but he did not testify.[9] The jury, after sending two notes stating that it was unable to reach a verdict, found appellant guilty of the lesser-included offense of second-degree murder while armed.

## II.

Appellant contends that the trial judge erred, under the rule of completeness, in permitting the government to introduce selective portions of appellant's audiotaped statement, which was played for the jury, while declining defense counsel's request that some of the omitted portions be admitted into evidence as well.

The government introduced material from twenty-five pages of appellant's eighty-page audiotaped statement to show that appellant gave false exculpatory information to the police and manipulated Cheryl Henderson with false promises of a tax refund, and to impeach him. In the admitted portions of his statement, appearing at various points throughout his audiotaped statement, appellant addressed three subjects: (1) he recounted his actions from 4:30 p.m. to 11 p.m. on the day of the murder, when he talked with his roommates, rested on his bed, drove to the grocery store, came back and rested again, later walked toward the apartment of a woman named Carla and spoke to her and her brother while they were sitting outside, and then returned to his apartment;[10] (2) he stated that he had last seen Cheryl Henderson the weekend before her death, when he had an uneventful meeting with her

---

do.... I wonder how the knife could go all the way through her.... She was a bony old bitch anyway." Nathaniel Brooks testified that appellant had been in a fight and had told the witness' brother that he would "do his things in the dark, wake up the next morning and find him on the side of the road, when the light come he be dead."

**8.** The evidence showed that an insurance agent had contacted appellant and his wife after they were married. Appellant's uncle testified that appellant had said he was going to use part of the money to bury his wife and the rest for a downpayment on a house.

**9.** Appellant's father testified that he took appellant to see attorney Lynn Brownley so "he could talk to him and get some advice," and that appellant appeared "shocked" and "upset" by the news of Cheryl Henderson's death. Several other defense witnesses also testified about appellant's shock and sadness after he learned of her

death. Another defense witness, who was present during the fight with the Brooks brothers when appellant implicitly admitted that he had killed Cheryl Henderson, *see supra* note 7, testified that he never heard any such comment.

**10.** In these portions of his statement appellant was questioned about the details of his alibi. He discussed the location of Carla's apartment in relation to his own, and stated that he did not know Carla's last name or her brother's full name. In another part of his statement, appellant explained that on the evening of June 23 he had received a telephone call from Crystal Ashton. Sometime after 6 p.m. or 6:30 p.m., went out and walked around, and at one point saw Carla and stood around talking to her and hanging around the pool. He returned to his apartment around 9:30 or 10 p.m.; Glenn Henderson was there with his son. Appellant stated that it was light when he walked over to the pool near Carla's apartment and dark when he returned home.

in Montross;[11] and (3) he claimed that Cheryl Henderson had filed an income tax return in 1986 and signed his name to it after he had told her to do so.[12] Defense counsel objected to the admission of the material constituting approximately twenty pages and requested that the judge admit additional portions of the transcript, so that the total admitted material by both parties would constitute fifty-nine pages of the eighty-page transcript of appellant's statement.[13] Concluding that the omitted portions that the defense sought to introduce were not "particularly germane," or "not on point," the trial judge denied defense counsel's request.[14]

On appeal, appellant contends generally that the omitted portions of his statement should have been admitted in order to reflect fairly the length and nature of his statement and to show that he had provided an explanation of his conduct. More specifically, appellant maintains that the "statements concerning other time periods were relevant and admissible to rebut the consciousness-of-guilt

**11.** In these portions of his statement, appellant stated that the last time he had seen or spoken to Cheryl Henderson was on Father's Day in Montross at her grandmother's house, which was next to the house where he was staying. She had told him that she was having problems with her car, and he had recommended a place where it could be repaired.

**12.** In these portions of his statement, appellant denied ever receiving an income tax refund. He stated that Cheryl Henderson told him that she needed money. He had told her that she could fill out the tax return and keep any money they might get back, although he doubted there would be a refund. Appellant stated that before Cheryl Henderson's death, he had received a letter from the IRS indicating that his refund had been withheld. Appellant denied ever discussing the refund money with Cheryl Henderson again. He also briefly discussed his general relationship with Cheryl Henderson, stating that she had left him in 1986, although she had subsequently come to live with him a few times after he had moved to this area from Montross.

**13.** In accordance with the trial judge's ruling on appellant's motion in limine, portions of the statement relating to alleged prior threats by appellant to Cheryl Henderson were excised from his statement. In addition, the parties agreed to exclude the pages where appellant speculated about who might have killed her.

**14.** Initially, during the government's case-in-chief, the trial judge stated that he was only

inference that the prosecutor tried to establish based upon appellant's actions and lack of explanations from the morning of June 23 throughout the pretrial period."

We first set forth the law on the rule of completeness, then summarize omitted portions of the statement that the defense sought to have admitted, and then provide the analysis for our conclusions that the trial judge abused his discretion and that the error appears harmful.

## A.

 Under the rule of completeness, a party is entitled, once part of a document or recorded statement has been introduced into evidence, to seek admission of the remainder of the statement. *Butler v. United States,* 614 A.2d 875, 882 (D.C.), *cert. denied,* —— U.S. ——, 113 S.Ct. 625, —— L.Ed.2d —— (1992); *Warren v. United States,* 515 A.2d 208, 210 (D.C.1986).[15] The rule stems from a fundamental recognition that:

> ruling on the fact that the prosecution was not required to introduce the entire statement in the presentation of its case. The trial judge invited defense counsel to raise the issue again in connection with permissible cross-examination of the government witnesses as well as in presentation of the defense case. The trial judge also advised defense counsel that he would permit the defense to address excluded portions of the statement during the defense cross-examination of the detective who took the statement.
>
> However, the trial judge subsequently changed his mind. He declined to permit the defense to question the detective on the excluded portions of the statement, stating that "the defense should be limited on cross-examination to the direct, just like it normally would be." He also precluded the defense from introducing the remaining portions of the statement, finding them "not [to] add to or in any way alter the statements that in fact are being offered into evidence," and to be "arguably self-serving statements by your client." The judge stated that the defense had failed to show how the situation had changed since the judge had ruled during the government's case-in-chief.

**15.** The government contends, relying on *Butler,* *supra,* 614 A.2d at 875, a co-defendant case, that the rule of completeness is designed only to avoid the exclusion of "substantially exculpatory" material that is related to the admitted portions in order to avoid distortion. This standard, however, reflects the court's analysis when multiple defendants are tried together and, under *Bru-*

[v]erbal utterances are attempts to express ideas in words. The more complicated the idea, the more elaborate is the structure of the verbal utterance.... It follows that the thought as a whole, and as it actually existed, cannot be ascertained without *taking the utterance as a whole* and comparing the successive elements and their mutual relations. To look at a part alone would be to obtain a false notion of the thought. The total—that is to say, the real—meaning can be got at only by going on to the end of the utterance. One part cannot be separated and taken by itself without doing injustice, by producing misrepresentation.

7 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2094, at 595 (James H. Chadbourn, ed., 1978) (footnote omitted). The rule is the product of two competing considerations. There is a concern that if only part of a statement is introduced, the statement may be unfairly removed from its context. 1 MCCORMICK ON EVIDENCE § 56, at 225 (John William Strong, ed., 4th ed. 1992); *see* 7 WIGMORE, *supra*, § 2113, at 659–60 (quoting "Sidney's celebrated example, if a person is charged with saying 'There is no God,' he appeals to the preceding clause, 'The fool hath said in his heart' "). In Professor McCormick's view, "[t]his danger, moreover, is not completely averted by a later, separate, supplying of the relevant omitted parts. The distorted impression may sometimes linger, and work its influence at the subconscious level." 1 MCCORMICK, *supra*, § 56, at 226. There is also the concern that requiring the complete statement to be admitted into evidence will waste time and juror attention by focusing on portions of the statement having no bearing on the point at issue. *Id.* Thus, the rule is not absolute in that the omitted portion of a statement is not automatically admissible in its entirety. *Id.*; *Warren, supra,* 515 A.2d at 210.

While the "right of the opponent to put in the remainder [of a statement] is universally conceded, for every kind of utterance without distinction," the difficulty in applying the rule of completeness arises when trying to ascertain "the scope and limits of the right." 7 WIGMORE, *supra*, § 2113, at 654. Professor McCormick suggests that "[u]ltimately, whether otherwise inadmissible evidence offered to explain, modify, qualify, or otherwise shed light on the part already received is admitted should depend upon whether its probative value in such regard is substantially outweighed by dangers of unfair prejudice, confusion of the issues, misleading the jury, or waste of time." 1 MCCORMICK, *supra*, § 56, at 228 (footnote omitted); *see id.*, § 56, at 226 ("all that explains or is useful in interpreting the part proved"). Dean Wigmore, in turn, posits three corollaries for application of the rule: first, "[n]o utterance irrelevant to the issue is receivable"; second, "[n]o more of the remainder of the utterance than concerns the same subject, and is explanatory of the [admitted] part is receivable"; and third, "[t]he remainder thus received merely aids in the construction of the utterance as a whole, and is not itself testimony." 7 WIGMORE, *supra*, § 2113, at 656 (footnote omitted). Each corollary has practical limitations.[16] With regard to the second corollary, the Dean observes that:

Nevertheless, it is perhaps undesirable in practice to enforce such a limitation, if it is likely to lead to cumbersome definitions and to lend itself rather to quibbling objections than to substantial improvement in the investigation of truth. The simple

---

ton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), a nontestifying codefendant's statement must be redacted to omit reference to the remaining codefendant(s). Since the concerns presented by *Bruton* are not at issue in the instant case, we have no occasion to apply the *Butler* standard in light of other controlling authority. As appellant argues in his reply brief, *Butler* was a severance case, and the limit that it "imposes on the general rule of completeness arises in the context of the competing concerns unique to co-defendant cases," where "the interest in completeness of utterances must be balanced against the co-defendant's Sixth Amendment right to confront in a properly joined case without violating *Bruton.*"

**16.** As to the first corollary, Dean Wigmore states that "[p]ractically, this limitation is often unenforceable where the remainder of the utterance is contained in a single writing." *Id.* Regarding the third corollary, Dean Wigmore acknowledges that it is not uncommon for courts to treat the remaining utterance as having testimonial value of its own.

rule, in the form today most commonly enforced, that 'the whole of what was said at the same time on the same subject' may be put in, has proved easily workable, and has been attended by no technical refinements in its use. It may therefore be said that the above limitation, though sound enough in principle, should not be sanctioned unless courts can trust themselves to leave its application *wholly* to the determination of the trial judge.

*Id.*, § 2113, at 659 (footnotes omitted) (emphasis added); *see also* 1 McCORMICK, *supra*, § 56 at 226, 228. This court has not left application entirely to the trial court. *See* *Warren*, *supra*, 515 A.2d at 211 (review of the denial of a rule-of-completeness request to introduce additional portions of a statement is for abuse of discretion).

 The principle underlying the rule of completeness is fairness. When properly invoked the rule is designed "to secure for the tribunal a complete understanding of the total tenor and effect of the utterance[s]." 7 WIGMORE, *supra*, § 2113, at 653 (quoted in *Warren*, *supra*, 515 A.2d at 210); *see also* 21 CHARLES A. WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE § 5077, at 365 (1977 & Supp.) ("[t]he standard which the judge is to apply to the requested additional material is whether 'it ought in fairness to be considered contemporaneously with' the writing already introduced by the proponent") (citing FED.R.EVID. 106). In application in criminal cases, the rule of completeness is typically implicated when the prosecution selectively introduces only the inculpatory portions of a statement made by the defendant. Although the decision with respect to admission of omitted parts falls within the sound discretion of the

trial judge, in order to implement the fairness purpose underlying the rule, the trial judge upon request *must* admit additional portions that "concern the same subject and explain the part already admitted." *Warren*, *supra*, 515 A.2d at 210; [17] *see also Johns v. United States*, 434 A.2d 463, 475 n. 19 (D.C. 1981) (where defendant's admission that she had stabbed decedent, followed by her claim of self-defense, was a continuous though interrupted statement at the police station, defendant was entitled to have the entire statement put into evidence). In addition, where the defense demonstrates that the admitted portions are misleading because of a lack of context, it follows under the rule that the trial judge should permit "such limited portions to be . . . introduced as will remove the distortion that otherwise would accompany the prosecution's evidence." *See United States v. Sutton*, 255 U.S.App.D.C. 307, 330, 801 F.2d 1346, 1369 (1986) (error, under FED. R.EVID. 106, to deny the defendant's motion for contemporaneous introduction of additional portions of transcript of his conversation demonstrating that his state of mind, a key issue at trial, was inconsistent with his guilt and thus removing the distortion created by the inculpatory admitted portions that tended to show a guilty state of mind).

 Furthermore, in a criminal case, the usual fairness concerns about partial admission of a defendant's statement are amplified by constitutional considerations. The rule of completeness must be applied to ensure that a defendant is not forced to choose between allowing his or her statement to stand distorted as a result of selective introduction and abandoning his or her Fifth Amendment right not to testify in order to clarify that statement.[18]

---

17. Having examined the sources cited by the court in *Warren*, *supra*, 515 A.2d 208, we construe the independent relevance discussion in that case as merely another way of expressing the fundamental purpose underlying the rule of completeness—fairness. The rule was designed to prevent parties from distorting the admitted portions by taking them out of context and, to that extent, misrepresenting the whole of a statement by only introducing part of it. *See* McCORMICK § 56, at 225. With respect to relevance, *Warren*, *supra*, simply concluded that the rule of completeness does not require admission of portions of a defendant's statement that have no

relevance to the other issues at trial, unless those portions concern or explain the parts already admitted.

18. *See, e.g.,* 21 WRIGHT & GRAHAM, *supra*, § 5077, at 369–70 ("[i]n criminal cases the court should consider the impact of constitutional safeguards on the application of the completeness doctrine. For example, one of the reasons why the common law required the prosecution to prove the entire confession of the defendant, including the exculpatory parts, is that often the defendant could controvert the partial showing only by waiving his privilege against self-incrimination");

Fairness dictates, we conclude, particularly when a prosecution relies on the defendant's conduct to show consciousness of guilt, that "[t]he simple rule ... that 'the whole of what was said at the same time on the same subject' may be put in" be applied in order to avoid "cumbersome definitions" and "quibbling objections." 7 WIGMORE, *supra*, § 2113, at 659; *see also* McCORMICK, *supra*, § 56 at 228 (quoted *supra* at 425).

## B.

To put our conclusions in context, we review omitted portions of appellant's audiotaped statement that he sought to have introduced into evidence. The government selected various portions of appellant's statement with regard to three topics: the Carla alibi, the tax return, and when appellant claimed he last saw his wife. The defense sought admission of seven additional portions of his statement; for purposes of this appeal, in light of our conclusions, we need only address three subject areas in the omitted portions.[19]

*Appellant's relationship with Cheryl Henderson:* The omitted portions included appellant's statement that he had only visited Cheryl Henderson at her job on one occasion, and that it was at her request. That one time he had gone with Stephanie Ashton and her little boy, and they actually had met Cheryl Henderson at a nearby restaurant.[20] At that time, according to the omitted portion of appellant's statement, Cheryl Henderson had told them that she wanted to move in with them because she and Bankhead were having serious drug problems and owed some money to "people on the street."[21] Appellant also expanded on Cheryl Henderson's own drug problems.[22] The trial judge rejected the defense rule-of-completeness argument on the ground that this portion of appellant's statement contained "some irrelevant material that [did not] have much bearing on the issues."

Appellant maintains that these omitted portions constituted an implicit denial by appellant that he had picked up Cheryl Henderson from work on the night that she was killed. A key part of the government's circumstantial case—based on the telephone call that appellant had received at the apartment shortly before Cheryl Henderson had taken her dinner break from work at 7:45 p.m.—was the theory that appellant had spoken with her on the telephone and arranged a meeting, picked her up at work, and later killed her. Moreover, appellant asserts, the omitted portions offered a different view of the nature of his relationship with Cheryl Henderson, partially countering the implications left by the admitted portions of appellant's statement (as supplemented by other government evidence) that appellant manipulated her. In addition, appellant contends that omitted portions cast doubt on the government's suggested motive of obsessive, un-

1 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE ¶ 106[01], at 106–9 (1992) ("if the prosecution makes an offer, the defendant's right against self-incrimination may be jeopardized if he is required to take the stand in order to introduce the omitted exculpatory portions of the confession"); *Sutton, supra*, 255 U.S.App.D.C. at 331, 801 F.2d at 1370; *United States v. Walker*, 652 F.2d 708, 713 (7th Cir.1981).

19. The eight-page appendix to appellant's brief provides a helpful analysis of the relevance of the seven omitted sections of appellant's audiotaped statement that the defense sought to have admitted at trial. However, for purposes of this appeal, we categorize the omitted portions by general subject matter, focusing on three subjects addressed in the omitted portions.

20. Appellant denied meeting Cheryl Henderson at any other time near her job or elsewhere in Maryland or the District of Columbia, although he noted that she sometimes came to his apartment.

21. Appellant stated that Cheryl Henderson had repeatedly said that she had to get away from Bankhead. He explained that Cheryl Henderson had come to live with appellant in February or March only because she had no place else to go.

22. Appellant explained that he and Cheryl Henderson had separated because she had certain problems, which he later learned—from her mother, others, and eventually from Cheryl Henderson herself—involved drugs. He also stated he had once overheard Glenn Henderson's girlfriend, Stephanie Ashton, tell someone on the telephone that Cheryl Henderson needed to leave the drug dealers alone. Appellant emphasized that he only telephoned Cheryl Henderson at her job in response to her telephone calls to him. He stated that the telephone calls mainly involved Cheryl Henderson asking him for money.

requited love as well as the testimony that he had lied when he told her relatives that she was involved with drugs.[23] According to appellant, omitted portions also countered the greed motive suggested by the government by explaining that it was Cheryl Henderson's dangerous drug-related life style that prompted him to comment that she should have life insurance.

*Activities on the date of the murder.* In other omitted portions of his statement, appellant explained that on June 23 he washed and waxed his car after waking up, and that he drove a man to the Maryland Department of Motor Vehicles. The trial judge ruled that this portion of appellant's statement was inadmissible because it involved only introductory material and the described events of June 23 preceded the relevant time period between 4:30 p.m. and 11 p.m.[24] The omitted portion also included the statement that appellant had decided not to go to work on June 23 because he was hung over and tired from having worked seven straight days. The trial judge excluded this portion on the basis that it contained "irrelevant material" not having much bearing on the issues in the case.

However, appellant maintains that this portion rebutted the inference of his consciousness of guilt arising from the fact that appellant, who was a steady worker, missed work on the day of Cheryl Henderson's murder. He argues that the nature of the government's evidence made the omitted portion germane to a key issue in the case: this portion took the sting out of one aspect of the government's premeditation theory by providing a reason for his missing work, thereby rebutting the implication that he changed his normal work habit on June 23

because he was planning to kill Cheryl Henderson. Furthermore, with regard to cleaning his car, the omitted portion would have presented his claim that the car had been washed before his wife's death, counteracting the implication, from the detective's trial testimony that appellant's car looked newly cleaned when inspected the day after the murder, that appellant had cleaned his car in order to remove incriminating evidence from it.

*The trip to Montross the day after the murder.* In other omitted portions of his statement, appellant explained that he took the ride to Montross the day after the murder to see his sister for her birthday. He also described the telephone conversation with his uncle Glenn Henderson when he heard the police officer in the background and then gave the officer directions to Montross. In addition, appellant talked about the discussion (at the Fast Mart and his father's workplace) with his father about the murder. The trial judge denied the defense request to admit these portions of appellant's statement, ruling that they concerned a time period that was not "particularly germane to the issues in the case."

Appellant argues these portions were admissible because they countered the government's consciousness-of-guilt claim that appellant's trip to Montross was suspicious and evidence of flight, by supplying an explanation (his sister's birthday) for his decision to join Charles Tate in the trip to Montross.[25] In addition, appellant maintains that his explanation for inquiring about the police officer during his telephone conversation with his uncle, in addition to his statement that he told the officer how to get to Montross, of-

---

**23.** The prosecutor argued in his closing argument to the jury that

to stab somebody up to five inches with a knife, and to do it 45 times ... that's making a statement. That is not just killing somebody. That's destroying somebody. The evidence in this case shows you the person who took Cheryl Henderson's life is destroying her. Who is the person who has wanted her since she was thirteen? This man right here.

**24.** This period generally corresponded to the time that Cheryl Henderson went to work, from 4 to 11 p.m.

**25.** In closing argument the prosecutor told the jury: "And never once since that day has there been an explanation of why Michael Henderson wanted to ride to Montross down in the country, an hour and a half from work," and, "If you stabbed your wife 45 times and all of a sudden you had to get to Montross so you're out of D.C. when they find her body, because you know the police are now coming for you...." *See infra* Part III.

fered a rebuttal to the government's theory that appellant indicated his consciousness of guilt by mentioning the police, by hiding from the police, and by fleeing from the area after the murder. Further, he argues, his description of the exchange with his father would have supplied the jury with evidence of his state of mind, indicating that the news of his wife's death had affected him, and thus negating the government's argument that appellant's state of mind and inaction were indicative of a callousness toward his wife's death.[26] This portion also offered, he continues, a rebuttal to testimony that appellant went to the Fast Mart, where he allegedly made inculpatory statements; according to appellant, his rendition of the events once he arrived in Montross demonstrated a state of mind inconsistent with Calvin Payne's account of his inculpatory monologue.[27] *See supra* note 7.

### C.

From our review of the omitted portions of appellant's statement, we reach two principal conclusions.[28] First, some omitted portions of appellant's statement were admissible to explain the portions that the government elected to introduce. Second, fairness required that other omitted portions be admitted, as part of the same statement given at the same time as the admitted portions on the same subject (the murder of Cheryl Henderson), in order to avoid presenting the jury with a distorted understanding of the tenor of appellant's statement and, thus, of the admitted portions.[29]

First, in view of the government's use of the portion containing the Carla Boykin "alibi" to show that appellant gave false exculpatory information in the form of a doubtful alibi, appellant was entitled to have admitted into evidence any omitted portion of his statement in which he implicitly or explicitly denied the murder. He was also entitled, as a result of the government's introduction of the portion of appellant's statement where he discussed the tax refund, to have admitted those portions that explained his relationship with Cheryl Henderson. By use of the tax refund issue, the prosecutor put before the jury an image depicting a close, manipulative relationship between appellant and Cheryl Henderson.[30] Omitted portions of appellant's statement addressed

---

**26.** Appellant told the police that learning of his wife's death "tore me to pieces. It just shocked me," and that he required nerve medication after her funeral.

**27.** Regarding the decision to consult an attorney, appellant maintains that his statement in the omitted portion that it was his father who informed him that he would be a suspect and suggested that he see a lawyer, explained his reasons for consulting with an attorney that day. Similarly, he argues that the omitted portion concerning the attorney countered both the government's evidence that it was appellant's own idea, not his father's, that appellant see an attorney and the consciousness-of-guilt inference based on the fact that appellant sought legal advice. He also argues that the omitted portions describing his relations with his roommates, his reaction to Cheryl Henderson's death and the nature of her visits to his apartment rebutted the consciousness-of-guilt inference arising from the prosecutor's persistent questioning of witnesses, and closing arguments, on the fact that appellant had failed to tell his father and his roommates where he was on the night of the murder and that he showed no remorse for Cheryl Henderson's death. For other reasons we conclude that the prosecutor's use of appellant's consultation of an attorney and silence thereafter

to show consciousness of guilt was error. *See infra* Part III.

**28.** Since the trial judge's exclusion of those omitted portions was total, we need not, in view of our conclusions, address all of appellant's contentions with regard to the omitted portions of his statement.

**29.** We do not reach the question of contemporaneous introduction.

**30.** In the admitted portion, appellant stated that, despite the fact that he had not received a tax refund for several years, and therefore was not expecting one, he had permitted Cheryl Henderson to file their tax return and told her she could have any refund they received. To demonstrate that appellant misled Cheryl Henderson about the refund and had lured her into meeting him with the prospect of getting the refund (possibly the night of the murder), the government coupled this portion of appellant's statement with testimony from an IRS agent that the refund due to appellant was automatically diverted to the Virginia state child support authorities and testimony from Bankhead that Cheryl Henderson had had several meetings with appellant in an effort to get the refund money from him.

this portrayal and the government's suggestion that appellant's exchanges with Cheryl Henderson about the tax refund were his way of continuing to have contact with her. Only appellant was in a position to claim that all contacts with Cheryl had been initiated by her and were in connection with the money problems which resulted from her involvement with drugs. Consequently, appellant was entitled under the rule to have admitted the portions that explained his relationship with Cheryl Henderson.[31]

 Secondly, given the fairness purpose of the rule, appellant was entitled to have introduced additional portions of his statement in which he explained his conduct on the day of the murder and the day after. Because of the manner in which the government developed its case against appellant, relying on his conduct to show consciousness of guilt, admission of omitted portions was necessary so that the jury would be aware of the full tenor of appellant's audiotaped statement.[32] *See supra* Part II b. Much of the government's case was based on showing that appellant's conduct demonstrated his consciousness of guilt, and the omitted por-

tions contained statements which provided alternative inferences that were consistent with appellant's innocence.

In the absence of direct evidence of appellant's guilt, the government relied on a consciousness-of-guilt theory that appellant's conduct on the day of the murder and his flight the next day, combined with his failure to explain where he was on the night of the murder, indicated his consciousness of guilt and thereby his guilt in fact. The government further suggested to the jury that an obsessive, unrequited love or greed had been the motive for the killing. Omitted portions of appellant's statement relating to appellant's activities on June 23, his trip to Montross on June 24, and his relationship with Cheryl Henderson were, as appellant argues, germane to these issues. *See supra* Part II b. The trial judge's restriction of the jury's consideration to the portions of appellant's statement that addressed only what he did between 4:30 p.m. and 11 p.m. on June 23 left the jury with a potentially distorted view of the total tenor and effect of appellant's statement as well as the context of the admitted portions.[33]

---

**31.** When the trial judge ruled that the government would not be required to introduce the omitted portions of appellant's statement, all of the witnesses in the government's case-in-chief had testified except the "alibi" witness (Carla Boykin) and the detective who took appellant's audiotaped statement after he was arrested. Hence, the trial judge was aware of the emphasis that the government was placing on the nature of appellant's relationship with Cheryl Henderson, *his failure to go to work on June 23, and his trip* to Montross the next day. Although the trial judge initially emphasized, during the government's case-in-chief, that he was not excluding the omitted portions, but would address their admissibility at a later time, the trial judge ultimately precluded all later efforts by the defense to have the omitted portions admitted into evidence, including cross-examination of the detective about the statement that he had taken from appellant. *See, supra,* note 14; *Johns, supra,* 434 A.2d at 475 n. 19. Thus, the trial judge never addressed contemporaneous admission of omitted portions. *See* McCormick, *supra,* § 56, at 226; Fed.R.Evid. 106 advisory committee's note (rule of completeness stems in part from concern about "the inadequacy of repair work when delayed to a point later in the trial").

**32.** *Cf.* James P. Gillespie, Note, *Federal Rule of Evidence 106: A Proposal to Return to the Common Law Rule of Completeness,* 62 Notre Dame

L.Rev. 382, 390 (1986) (describing use of the rule as a "door opening" technique—"a party, when offering a portion of a writing or recorded statement into evidence, must anticipate the adversary taking advantage of the opportunity to introduce portions of the remainder of the statement, which would have been otherwise inadmissible").

Moreover, the government's reliance on *United States v. Dorrell,* 758 F.2d 427 (9th Cir.1985), is misplaced. In that case the court held that the district court had not abused its discretion in redacting portions of the defendant's confession that related to his religious and political motivation for *willfully injuring government property* and knowingly entering an air force missile base. *Id.* at 435. The court concluded, in view of the fact that the defendant was not entitled to raise a necessity defense, that the redaction "did not create a misleading impression by taking matters out of context" because it "did not change the meaning of the [admitted] portions of his confession." *Id.* By contrast, in the instant case, the unavailability of a defense did not render omitted portions of appellant's statement irrelevant or lacking in probative value to clarify the admitted portions.

**33.** There was no evidence on the precise time of Cheryl Henderson's death. There was only evidence that Cheryl Henderson was not seen after

For example, as part of the government's circumstantial case, the prosecutor emphasized that appellant, a notoriously steady worker who liked to be on the job the day that the supervisor was, had suspiciously skipped work the day of Cheryl Henderson's murder when the supervisor was to be there.[34] The obvious suggestion was that appellant had stayed home to plan his wife's murder. Similarly, the prosecutor emphasized that appellant's trip to Montross the next day was evidence of flight, reenforcing the inference of appellant's consciousness-of-guilt. The jury never heard, in appellant's own words, appellant's explanation for his decision to stay home that day and his reason for going to Montross the following day. As his argument makes clear, *see supra* Part II b, omitted portions of his statement countered the consciousness-of-guilt inferences urged by the government. The jury also did not hear portions of appellant's statement that disputed the negative light that the government's other evidence cast on the admitted portions, as for example, the effect of the testimony that any tax refund due to appellant would be automatically withheld by state child support enforcement authorities on appellant's statement that he allowed Cheryl Henderson to sign his name to a tax return and told her that she could have any refund they received.

◼ From these conclusions with regard to omitted portions, we conclude as well that, as a practical matter, in order to carry out the purpose of the rule of completeness, "[t]he simple rule . . . that 'the whole of what was said at the same time on the same subject' may be put in"—weighs heavily in favor of admission of the omitted portions that the defense requested be admitted. *See*

7 WIGMORE, *supra*, § 2113, at 659. The omitted portions either explained the admitted parts selected by the government or were independently relevant to issues at the trial and, thus, by their admission would have shed light on the admitted portions. *See supra* Part II b. Too much parsing of "the simple rule" tends to undermine the fairness purpose and invite endless rulings and appeals that have little to do with affording the jury a fair understanding of the utterances at issue. In the instant case, the government's reliance on a consciousness-of-guilt theory heightened the need for the jury to have a complete understanding of the tenor of appellant's entire statement in order to be able fairly to evaluate the inference from the government's use of the admitted portions—namely, that appellant's conduct demonstrated premeditation, deliberation, and consciousness of guilt. *Cf. Allen v. United States*, 603 A.2d 1219, 1231 (D.C.) (Rogers, C.J., concurring) (validity of consciousness-of-guilt inference turns on the defendant's state of mind; "improper inferences [based on defendant's inaction] are likely to be overvalued by juries") (citations omitted), *cert. denied*, —— U.S. ——, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992). Under the rule of completeness, fairness called for admission of additional portions of appellant's statement about June 23 and 24 so that the jury would have a complete understanding of the tenor of his statement to the police.

### D.

◼ In assessing the harmlessness of the error, we apply the *Kotteakos*[35] standard to the trial judge's denial of defense requests for admission of omitted portions of appellant's audiotaped statement.[36] The govern-

---

7:45 p.m. June 23 and that around 10:00 p.m. two children heard screams from the area where her body was later discovered.

34. Charles Tate testified that appellant was a "very good employee" in terms of coming to work every day, and that Tuesday was the most important work day of the week because the vice president and some supervisors would come to the site to assess progress. Tate testified that appellant was aware of the importance of that day.

35. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *see Sutton, supra*, 255 U.S.App.D.C. at 331, 801 F.2d at 1370 (applying *Kotteakos* standard for violation of rule of completeness under FED.R.EVID. 106).

36. Appellant was also denied the right to cross-examine the detective about the full statement that he had taken from appellant. The standard of *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), would normally apply where there had been a denial of

ment's evidence against appellant was purely circumstantial. There was no witness to the stabbing who could identify the killer and no one placed appellant with Cheryl Henderson on the night that she was killed. The linchpin of the prosecution's direct evidence—the purple hat—was hardly conclusive; no one saw appellant wearing it on the date Cheryl Henderson was murdered and appellant shared an apartment to which others had access. Moreover, other physical evidence appeared to be exculpatory.[37] No weapon was recovered or linked to the killing. Further, the "alibi" witness (Carla Boykin), who was not contacted until four years after the murder and who stated that she had never had a personal conversation with appellant, conceded that she could not remember anything specific about the day of the murder. In fact, much of the government's case rested on appellant's audiotaped statements and his failure to fully explain where he was on the night of the murder, as emphasized by the prosecutor in his examination of witnesses and closing arguments to the jury.

In this kind of case—where the government relied on appellant's conduct to show consciousness of guilt and on innuendo as to motive, where there was no direct evidence of guilt and circumstantial evidence that was consistent with either guilt or innocence, and the jury twice reported that it was unable to reach a unanimous verdict—it is difficult to conclude that the error in denying all defense requests to admit omitted portions of appellant's audiotaped statement and to use omitted portions to cross-examine the detective who took the statement was harmless. There was some other evidence about appel-

lant's relationship with Cheryl Henderson and his roommates, his activities on June 23 and 24, and evidence about his sister's birthdate. However, the admitted portions did not reveal information that only appellant knew about his relationship with Cheryl Henderson, much less include his explanation of his conduct on June 23 and 24. Therein lay the gravamen of the trial judge's error. *See* WIGMORE, *supra,* § 2094 at 595 ("To look at the part alone would be to obtain a false notion of the thought. The total—that is to say, the real—meaning can be got at only by going on to the end of the utterance"). Furthermore, the prejudice to appellant from the exclusion of the omitted portions of his statement was compounded by the prosecutor's use, throughout the trial, of appellant's decision to consult an attorney and his failure thereafter to explain to his father and roommates about where he was on the night of the murder to show guilt. *See infra* Part III. Consequently, we hold that the evidentiary errors, taken together with the prosecutorial errors, were not harmless.

### III.

▮▮▮▮ Appellant also contends that his conviction must be reversed because the prosecutor improperly commented on, and repeatedly drew the jury's attention to, his consultation with attorney Brownley the day after Cheryl Henderson's murder. On purely evidentiary grounds, it is inadmissible because, as the Maryland Court of Special Appeals has observed:

> common human experience would suggest that, absent some special circumstance not

a right of cross-examination. *See Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *see also Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973) ("[t]he right of an accused ... to due process is, in essence, the right to a fair opportunity to defend against the State's accusations"); *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967) ("[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies"); *Bassil v. United States*, 517 A.2d 714, 716 (D.C.1986). On this record we need not resolve which standard

should ultimately apply since our conclusion about the harmfulness of the error would be the same under either standard.

37. For example, the mobile crime unit officer testified that there was human skin under Cheryl Henderson's fingernails, indicating that she had presumably scratched her attacker. Although he removed fingernail clippings and submitted them for analysis, the government never presented the results. Appellant's roommate (Charles Tate) testified that he did *not* observe any scratches or injuries on appellant the morning of June 24; his uncle (Glenn Henderson) testified that he did not see any such injuries on appellant when he returned from Montross two days later.

evident here, the most likely purpose for seeking legal advice or representation is to find out what one's status and exposure may be. If there is a rational inference to be drawn from the seeking of such advice or representation therefore, it cannot be more than that—an uncertainty.[38]

*(Russell) Hunter v. State,* 82 Md.App. 679, 573 A.2d 85, 91 (1990); *see Waddell v. State,* 25 Md.App. 54, 582 A.2d 260, 265 (1990). In *(Kevin) Hunter v. United States,* 606 A.2d 139, 143 (D.C.), *cert. denied,* — U.S. —, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992), the court reached a similar conclusion, stating that the defendant's failure following his indictment to disclose his defense to the prosecutor was "not at all probative as to his credibility" (citing *Walker v. United States,* 402 A.2d 424, 427 (D.C.1979) (pointing out that "knowing that one is the focus of a criminal action serves to make one more cautious about the advisability of discussing one's defense with others than [one's] attorney")). More significantly, the Fifth Amendment precludes a prosecutor from eliciting the defendant's action in consulting an attorney because of "the tendency of such testimony to serve as the base for an inference of guilt based on such an act." *United States v. Williams,* 181 U.S.App.D.C. 188, 189, 556 F.2d 65, 66 (citation omitted), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977); *id.* at 190, 556 F.2d at 67 ("[t]estimony about the desire or request for a lawyer is impermissible") (citations omitted).

In the instant case, from the opening statement to the jury throughout the presentation of the evidence, the prosecutor drew attention to the fact that appellant had sought legal advice the day after his wife's murder.[39] The prosecutor returned to the consultation theme in his closing and rebuttal arguments to the jury.[40] In effect, the prosecutor asked the jurors to draw a negative inference from appellant's decision to seek legal advice. This was improper. As the court has recognized, "[m]ost jurors ... are not schooled in the law." *(Kevin) Hunter, supra,* 606 A.2d at 144. From the government's evidence and arguments, a juror might easily draw the

**38.** The Maryland Court of Special Appeals stated:

> The exercise of this right does not imply a consciousness of guilt. In seeking legal advice or representation, the person may well believe himself culpable[,] ... entirely innocent or only partly culpable, or he simply may not know whether his acts or omissions are in violation of law.... To draw an inference of consciousness of guilt from the seeking of such advice, then, is both illogical and unwarranted; the fact to be inferred—the consciousness of guilt—is not made more probable (or less probable) from the mere seeking of legal advice or representation, and so evidence of the predicate fact is simply irrelevant.

*(Russell) Hunter, supra,* 573 A.2d at 91.

**39.** In his opening statement to the jury, the prosecutor focused on this behavior of appellant's on June 24 in an effort to demonstrate consciousness of guilt. The prosecutor stated:

> Michael Henderson, the evidence will show you, did not go to see his son then living in Montross with Cheryl Henderson's mother, then about four or five years old. Michael Henderson, the evidence will show you, did not return to the District of Columbia to see about his wife, the woman he's begged to come back. *The evidence will show you that Michael Henderson went that night to see his lawyer.* (emphasis added)

Throughout the presentation of evidence, the prosecutor elicited testimony that appellant had been to see an attorney the day after Cheryl Henderson's murder and sought to establish that he did so on his own initiative. During direct examination of appellant's roommate Charles Tate, the prosecutor elicited that after appellant's father informed appellant that he would likely be a suspect in the case, "[h]e decided to go see a lawyer or somebody." In addition, in cross-examining defense witness Larry Thomas (who was also present during this conversation), the prosecutor honed in on the fact that it was appellant's idea to see an attorney.

**40.** In his initial closing argument, the prosecutor stated:

> Ladies and gentlemen, when they get to Montross, Michael doesn't say anything about Carla. And you heard his own witnesses not be able to agree on where the conversation was— what was being said of who was there. All you heard from Michael Henderson's father was that he wanted to go to Lynn Brownley's house. And what you heard from Larry Thomas was, it wasn't even Mr. Henderson's idea. It was Michael's idea. The only thing said was, "Take me to Lynn's house. Take me to Brownley's."

Repeating this same point in rebuttal closing argument, the prosecutor told the jury, "as Larry Thomas recalled, after Alan and [appellant] had gone and it was [appellant] who said, 'Take me to Lynn Brownley's.' It wasn't his father's idea."

inference urged by the prosecutor, namely that it was appellant's idea to seek counsel "because he had done something for which he needed a lawyer to defend him." *Waddell, supra,* 582 A.2d at 266. Indeed, the government's consciousness-of-guilt theory rendered the comments on consultation with counsel particularly prejudicial. *See (Russell) Hunter, supra,* 573 A.2d at 89 ("the rule seems well-established that it is impermissible for the State to offer evidence of, or comment upon, a criminal defendant's obtention of counsel or his attempt, request, or desire to obtain counsel *in order to show a consciousness of guilt"*) (emphasis added).

■ In addition, the prosecutor improperly implied during his questioning of witnesses and in his arguments to the jury that appellant's failure, after he had consulted with counsel, to explain to others where he was on the night of the murder demonstrated guilt. Appellant properly complains that despite the fact that the evidence showed that appellant met with attorney Brownley on the night of June 24 and was advised not to talk about the case or Cheryl Henderson, "the prosecutor elicited extensive testimony about appellant's failure to explain where he was or discuss his wife's death following the meeting with the lawyer,[41] and later argued to the jury that an innocent man would have explained himself." [42]

■ Before impeachment by omission is properly permitted, the trial court is required to make a threshold determination that the defendant's pretrial statement omitted a material circumstance which the defendant mentions later but which also would have been natural for the defendant to have mentioned in the prior statement. *See Hill v. United States,* 404 A.2d 525, 531 (D.C. 1979), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980). Here, appellant's silence was not in response to questioning by law enforcement officials, but it was simply his decision, after consultation with counsel, not to speak to his friends about where he was on the night of Cheryl Henderson's murder. The court has recognized that it is improper for a prosecutor to ask the jury to draw an unfavorable inference from the fact that the defendant failed to volunteer his account of the relevant events to the government after receiving legal counsel. *(Kevin) Hunter, supra,* 606 A.2d at 143–44. A competent attorney will typically provide, and instruct his client to provide, information about evidence and strategy to others only where it is likely to result in the dismissal of charges or a favorable plea agreement, or some other benefit to the client. *Id.* at 144. In *(Kevin) Hunter, supra,* the court described the potential danger of prejudice lurking in allowing prosecutorial comment on post-consultation silence.[43] While the omission here related principally to appellant's failure to give information to his father and roommates as opposed to the police, the same concern about jurors' lack of legal sophistication is implicated in both situ-

---

41. In his opening statement to the jury, the prosecutor, over defense objection, emphasized that appellant "has never said to any of his roommates where he was. [Defense objection overruled.] He has never said to any of his roommates where he was at the time Cheryl Henderson, the wife he wanted to come back, is stabbed 30 times and left in the weeds." This approach continued throughout the prosecutor's examination of witnesses, as he elicited testimony from each of appellant's roommates and his father that appellant had never explained where he was at the time of Cheryl Henderson's murder.

42. The prosecutor made the same point in his initial closing and rebuttal closing arguments to the jury. *See infra* note 43. The defense objection to the reference to appellant's silence with regard to his lawyer and his silence thereafter was overruled.

43. In *(Kevin) Hunter, supra,* 606 A.2d at 144, the court explained that:

> Most jurors ... are not schooled in the law.... Not being acquainted with the perils and pitfalls of premature disclosure of one's case to one's adversary, a fair-minded juror might well perceive a good deal of common sense in an argument of the kind with which the prosecutor attempted to skewer Hunter in this case—"if he had an innocent explanation, why didn't he tell the United States Attorney and get him to dismiss the charges?" If prosecutors were allowed to make tactical hay out of a defense attorney's prudent decision not to present the government with unreciprocated impeachment materials and free discovery, the exercise of a wise and constitutionally based strategy would be severely chilled.

ations. *See Walker, supra,* 402 A.2d at 427 (silence with regard to probation officer). Moreover, some of the prosecutor's comments can be fairly construed as pertaining to silence regarding the police because the prosecutor inquired why appellant would not tell his friends to take Carla Boykin, the "alibi" witness, to the police.[44] *See Morris v. United States,* 622 A.2d 1116, 1123–24 (D.C. 1993); *cf. Allen, supra,* 603 A.2d at 1222–23. The government conceded at oral argument that the comments by the prosecutor on appellant's silence after consulting with counsel probably constituted error.

■ Because the prejudice to appellant from the continual emphasis placed by the prosecutor on appellant's decision to consult counsel and his post-consultation failure to explain where he was and what his defense might be, combined with the error in denying defense requests to introduce additional portions of appellant's statement to the police, was substantially prejudicial,[45] *see Sherrod v. United States,* 478 A.2d 644, 655 (D.C.1984) (standard of review), we reverse the judgment of conviction and remand the case for a new trial.

■

**44.** The prosecutor stated in both his initial and rebuttal closing argument to the jury that:

> For the four years since that night until today, Michael Henderson has never said to them [roommates and Kendall Ashton], other than, "I was messing around." To none of them did he say the word "Carla."
>
> \* \* \* \* \* \*
>
> Remember that this man didn't take that opportunity to say to his roommates, "Listen, do you know Carla that comes to see Stephanie, your girlfriend and mother of Little Glen[n], the lady living with us back then? Glen[n], take them down the road over to Carla's. Find Carla. I was with her last night." Didn't happen...
>
> And then he said, "Oh, I was out messing around." All he had to do was say, "Find Carla, guys. I was with Carla."
>
> In his rebuttal closing argument to the jury, the prosecutor continued the theme that appellant's failure to tell anyone where he was the night of Cheryl Henderson's murder was indicative of guilt:
>
> Ladies and gentlemen, who had the opportunity to tell Glen that, or his father that, or the first lawyer he spoke to, the very night or the night after [objection] ...
>
> If he's been with Carla the night before, "Glen, tell the police officers to go down where the road splits. Go down to that first complex.

> You know Carla. She comes and visits Stephanie. Well [sic] all know Carla. Find Carla."
>
> \* \* \* \* \* \*
>
> No mention of Carla until the 23rd of December, six months later, in the presence of Mr. Newton and the Assistant U.S. Attorney, and then he tells you about Carla.
>
> \* \* \* \* \* \*
>
> Michael Henderson had several opportunities to talk about Carla, not once.
> [DEFENSE COUNSEL]: Your Honor, I am going to object. It is shifting the burden to the defense. The defense doesn't have to prove anything.
> THE COURT: Overruled.
> [PROSECUTOR]: Ladies and gentlemen, to his friends, to his father, to his uncle, not one time....

**45.** Appellant preserved this objection for appeal. When the prosecutor made the initial comment in his opening statement to the jury, defense counsel promptly objected and was overruled. In addition, defense counsel also objected to the same comments when they were made in the prosecutor's rebuttal closing argument. *Cf. (Kevin) Hunter, supra,* 606 A.2d at 145 (objection at conclusion of closing argument sufficient to preserve issue for appeal).