Warnell **REAMS**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 03–CF–1116.

District of Columbia Court of Appeals.

Argued Feb. 1, 2006.

Decided April 6, 2006.

M. Eve Hanan, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Melissa M. Nasrah, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and David B. Goodhand and Kevin F. Flynn, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and GLICKMAN, Associate Judges, and KERN, Senior Judge.

FARRELL, Associate Judge:

A jury convicted appellant (hereafter "Reams") of first degree murder while armed, assault with intent to kill while armed, aggravated assault while armed, and related firearms offenses. The charges all arose from the June 11, 2001, shooting death of Shaun Williams and the shooting of Donte Jenkins, who survived. The government's theory was that Reams fired the shots at a group of young men from the Ivy City neighborhood who had fought with him some weeks earlier. One eyewitness saw Reams fire the shots over the top of a car while "sitting up" in the front passenger-side window. Three other witnesses, after hearing the shots, saw Reams seconds later likewise hanging out of the passenger window of the car; two of them saw him leaning over the top with a gun in his hand.

Reams's principal claim of error on appeal concerns the trial judge's exclusion of parts of a hearsay statement he had made to the police a couple of weeks after the shooting. The judge had permitted the government, through a police witness, to summarize a portion of the statement in which Reams denied having returned to Ivy City after the fight—the relevance of this, to the prosecution, being that Reams, a regular habitué of Ivy City in the past, had "exiled" himself from the neighborhood in anger over the fight until he in fact returned to exact revenge against his assailants. Reams argues, for two reasons, that the judge's refusal to admit other parts of his statement reasonably could have misled the jury into giving his remarks to the police inculpatory significance that, viewed in their entirety, they would not have had.

We conclude that, although the trial judge erred in not permitting Reams to introduce—under the doctrine of completeness—other relevant portions of his police statement, the error was not prejudicial enough to warrant reversal of his convictions, particularly in light of the strong eyewitness evidence of his guilt. As we

reject his other assigned ground for reversal as well, we affirm.

## I. The Evidence

Although Reams did not live in Ivy City, he regularly spent time there in the company of young men who lived there and with whom he was more or less friendly. Some weeks before June 11, 2001, however, a fight broke out in the neighborhood between Reams and Vernon Gilchrist over some words used by Reams. After Reams knocked Gilchrist down, several others came to Gilchrist's aid, including Donte Jenkins, and punches were exchanged. After Reams was chased up the street, Shaun Williams broke up the fight and Reams left in his car, a white Crown Victoria. None of the three participants who testified—Jenkins, Gilchrist, and Michael Overby—saw Reams hang around Ivy City after the fight, although Overby saw him drive through a couple of times.

On June 11, 2001, Jenkins, Overby and others were playing dice on Capitol Avenue in the Ivy City neighborhood when they were joined by Williams. A car approached, and as it turned onto Capitol Avenue, Overby saw a "gun come out" and heard "bullets ... flying past [his] head." Jenkins was shot several times, but recovered from the wounds; Williams was shot twice in the back and died from the injuries.

Westley Ashe, a fifty-year old neighborhood car mechanic, saw the shooting from his nearby car lot. Earlier that day he had seen a greenish or bluish Ford Taurus station wagon turn onto Capitol Avenue; Reams got out of the car momentarily and talked to someone, after which the car pulled down the street. A short time later, Ashe heard ten or more gunshots and saw someone "sitting up in [the station wagon] in the window[,] shooting" at others who were running. The gunfire came "from on top of the car, on the passenger side," and he recognized Reams as the shooter. Although Ashe could not see Reams's face, he "could see his whole back down through where his butt was like sitting in the window." He had known Reams for more than ten years,[1] and recognized him because "being around a person so long ... you can look at them and you can tell it from, it's just from years of experience, of knowing him." Moreover, from where Ashe was standing he could see Reams from "the back and the full side ... a little bit on the side because [Ashe] was on an angle." He recognized Reams as the shooter "due to the fact of [his] back[,] looking at him and knowing him so many years and the average person do[esn't] have a back that long."

Three other eyewitnesses corroborated Ashe's testimony. Aiesha Jackson, Tanosha Harris, and Dawn Blake were good friends who lived or spent time in Ivy City. They were all friends with Overby, Jenkins, Gilchrist, and Williams. Harris and Blake were also each friendly with or a "buddy" of Reams, and would see him in Ivy City nearly every day. Jackson testified that on June 11, after walking together to a nearby store, she and the other women were walking back up the street when they heard gunshots fired. After they paused and then resumed walking, she saw a blue Taurus station wagon drive by; Reams was hanging out and over the top of the car on the passenger side holding a gun. He was wearing a bandanna on his head (something Ashe had also noticed) and was looking back up the street as the car drove past. Jackson then saw Jenkins

---

1. Over the past five to six months Ashe had seen Reams in the area and would talk to him "[a]bout every day."

lying in the street and Williams lying in the bushes.

Tanosha Harris testified that for about a year before the shooting Reams would appear "like every other day" in Ivy City in a blue Ford Taurus station wagon. Earlier on the day of the shooting, she had seen him seated in the passenger side of that car. Later in the evening as the three women were returning from the store, she heard gunshots, and as the three "made a U-turn back in[to] Ivy City," she saw the blue Ford Taurus station wagon drive past with Reams hanging out of the passenger side holding a gun with two hands, wearing a bandanna and looking straight over the top of the car.

Dawn Blake too had known Reams from his frequent presence in Ivy City. He drove a blue Taurus station wagon that he told her he had bought at an auction. As she and the other two women were walking up the street from the store on June 11, she heard gunshots and saw the blue Ford Taurus come down the street. Reams was leaning "[h]alfway out" of the car on the passenger side, "trying to get back in the window," "scooting down." Blake did not get a good look at his hands or see anything in them. He was wearing a bandanna on his head.

Reams did not testify and presented only one witness, a defense investigator who had made certain measurements and photographs of the crime scene.

## II. Discussion

By a motion in limine, the prosecutor sought leave to present testimony about "portions of [Reams's] statement [to the police] in which he describe[d] (1) the fight ... he had [had] with other individuals in the Ivy City neighborhood, and which the government contends supplied the motive for the shooting; and (2) his subsequent voluntary absence from the Ivy City neigh-

borhood in the weeks after the fighting and before the shooting." The prosecutor's theory, as he stated at a subsequent hearing, was that Reams's admission that "he does not go back to the area after the fight is over [demonstrated] ... conduct ... consistent with his having been shamed and basically using that time to plot ... revenge or whatever." At the same time, the prosecutor moved to bar the defense from introducing "[t]he remainder of [Reams's] statement ... consisting of general denials and a claim of alibi," which in the prosecutor's view were self-serving hearsay that did not elucidate the fight as a likely motive or not for the subsequent shooting. The defense, by contrast, sought admission of all or at least other parts of the statement under the doctrine of completeness. *See generally Henderson v. United States*, 632 A.2d 419, 424–27 (D.C.1993); FED. R. EVID. 106.

After hearing argument on the motion, the trial judge ruled that either party could introduce "the portions of the statement that relate to the day of the fight," but that "portions of the statement that relate to the day of the homicide may not come in." This, in the judge's view, would avoid the distortions of selective admission—against which the completeness rule protects—by allowing the parties to "[put in] the whole of what was said at the same time on the same subject," quoting *Henderson*, 632 A.2d at 427 (citations by *Henderson* omitted). On that basis, the judge subsequently permitted the government to present testimony by a detective who had attended the interview, in which Reams explained that, whereas he had spent time in Ivy City "almost every day" before the fight, he did not return to Ivy City after the fight and had not seen the men he fought with again.

Reams contends that the judge committed reversible error by excluding other

portions of his police statement that, in his view, would have undermined the government's use of the statement to show his motive and further would have neutralized the impression that he had given only an unadorned, conclusory (and thus inferentially false) account of his whereabouts at the time of the shooting. In making both arguments, Reams relies on the completeness doctrine, which this court summarized in *Henderson, supra,* as follows:

> The principle underlying the rule of completeness is fairness. When properly invoked the rule is designed "to secure for the tribunal a complete understanding of the total tenor and effect of the utterances." ... Although the decision with respect to admission of omitted parts falls within the sound discretion of the trial judge, in order to implement the fairness purpose underlying the rule, the trial judge upon request *must* admit additional portions that "concern the same subject and explain the part already admitted." In addition, where the defense demonstrates that the admitted portions are misleading because of a lack of context, it follows under the rule that the trial judge should permit "such limited portions to be ... introduced as will remove the distortion that otherwise would accompany the prosecution's evidence."

632 A.2d at 426 (citations omitted; emphasis in original). Despite these overarching legal principles, Reams's two arguments for why the completeness rule was violated must be dealt with separately, in part because, as we conclude, each is subject to a different standard of review.

### A. Rebuttal of the proof of motive

■ Reams first argues that, even if the trial judge could properly exclude his hearsay version of his whereabouts at the time of the shooting, it was important for the jury to hear his explanation for why in the weeks following the fight he had not returned to Ivy City—contrary to the prosecution's theory that he had "exiled" himself in smoldering anger over the fight. He refers in particular to the portion of the statement where, after telling the police that he had stayed "in the house" for "the last two weeks in May and the whole [month of] June," he had explained why:

> Me and my nephew, I mean getting my nieces preparation to go to school, fixing the meals, you know, getting them up in the morning so they can go to school each—each and every day. Cause it was close to school coming up. So, you know, I stayed in the house, you know. Cook them dinner, cook them breakfast. Don't go nowhere. Stay in the house, watch T.V., play video-games. It wasn't no reason for me to leave the house. Or, go next door and talk to my neighbor, and come right back in.

Reams argues that by excluding this portion of the statement the judge denied the jury "insight into his lifestyle and the way in which he would likely make a decision about what activities to engage in on a given day"—the "full picture," in other words, "of a young man who was without a particular agenda, ... who weighed hanging out on the street against staying home and watching television" (Br. for App. at 23).

Reams has failed to preserve this claim, as a review of the hearing on the government's motion in limine makes clear. Reams did explain to the judge, initially, that in contrast to the government's theory that he "does the shooting in June ... because he gets into this fight," in other portions of the statement he "describe[d] the fight as being innocuous" and that what he does instead of going back to the neighborhood is to stay home and "focus on taking care of [his] niece and nephew and helping out." The judge immediately

replied: *"All of that would come in, though; right? If he is talking about the fight, if he says it was innocuous, that comes in.... The point you are raising, actually would be available to the jury."* (Emphasis added.) Despite these signals that the judge believed some of Reams's post-fight behavior—his "innocuous[ly]" staying home to care for the children—admissible through his statement, Reams effectively let the matter drop, remaining silent when it soon became evident that the judge understood the parties to be disputing the admissibility of Reams's account of his actions on the date of the shooting itself. Twice the judge stated that it "seem[ed] to [him] the correct rule [was] that the portion of the statement that relates to the fight ... can come in," but that "[t]he portion ... that relates to the day of the murder may not come in." On neither of these occasions did Reams assert that he desired to introduce proof of something less or more limited—his *interim* behavior in the weeks after the fight—to show why that and not the "innocuous" fight explained his not having returned to Ivy City. Indeed, he did not do so even when the judge ultimately put the burden on the parties to review the videotape of the statement and "agree on what" statements related to the fight or went "to the subject of the motive," adding that "[a]ny portion of this tape *about* the fight that [the government] ha[s] not chosen can come in" (emphasis added). Following the government's testimony about the statement, Reams did not seek to revisit the issue of admissibility on cross-examination or in his own case.

In these circumstances, to find error by the trial judge in excluding other portions of the statement related to Reams's conduct after the fight would amount to blind-siding. "[A] defendant [must] demonstrate with particularity the unfairness in the selective admission of his post-arrest statement." *United States v. Branch*, 91 F.3d 699, 729 (5th Cir.1996). Particularly when nothing in the judge's subsequent remarks contradicted his apparent initial receptiveness to admitting parts of the statement that shed different—more "innocuous"—light on Reams's post-fight change of behavior, faulting the judge for Reams's own failure to press the issue of admitting those portions would itself be an unfair application of the rule.

 We thus review this claim of violation of the completeness doctrine under the plain error standard. *See generally United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). An initial question is whether it should have been "obvious" to the trial judge, *id.* at 734, 113 S.Ct. 1770, that without hearing other portions of Reams's statement the jury might form a distorted impression—concerning motive—from Reams's admission that he had not returned to Ivy City after the fight. Answering that question is complicated by the fact that at the time the judge applied the doctrine he had not, as he pointed out, viewed the videotape of the statement and was ruling strictly on the proffers of the parties;[2] this makes it difficult for us to say that at that point he should have "plainly" recognized what additional portions of the statement would, and what would not, be necessary to give the jury the "full picture" of Reams's post-fight change in behavior. Even assuming, however, that the judge should have recognized the obvious relevance of other portions of the statement to counter the government's use of it to prove motive, Reams may not obtain reversal on this ground unless he can show that the error resulted

---

**2.** "I will take a look at the video and make sure that ... your proffers haven't resulted in

some sort of distortion of what we're dealing with here."

in a "miscarriage of justice" by "'seriously affect[ing] the fairness, integrity or public reputation of [the] judicial proceedings.'" *Id.* at 736, 113 S.Ct. 1770 (citations omitted). He has not done so. Five government witnesses confirmed that Reams's habit of spending part of nearly every day in Ivy City before the fight changed afterwards, so that he was never there (Gilchrist, Jenkins) or there much less (Overby, Jackson) because, in Ashe's words, the men "like more or less got the distance between them" after the fight. Further, although Reams's statement in full offered another possible reason for his absence, the combined testimony of four eyewitnesses supported a strong inference that when he did return to the neighborhood on June 11, he did so to settle a score with Williams, Jenkins, and others who had fought with him at the earlier time. Realistically viewed, his police statement could have had only marginal effect on that evidence.

## B. The statement as false exculpatory

Reams's second ground for asserting that the jury was misled by the exclusion of portions of his statement is that a jury learning only (as it did) that he had denied having returned to Ivy City after the fight would infer

> that he could provide no account for his whereabouts on the night of the shooting. This [in turn] suggested guilt. An innocent person would attempt to account for his or her activities at the time of the shooting rather than simply deny his or her presence at the location of the shooting. (Br. for App. at 30.)

In point of fact, Reams explains, his statement to the police gave an account of his activities on the day and night of the shooting: he was at home with his girlfriend (whose name and address he furnished to the police) that evening "[w]atch-ing T.V., cooking dinner . . . I know I was in the house," a day moreover that stood out in his memory because he had earlier gone to the courthouse to provide a urine sample for a drug program. But a jury learning only his "blanket denial that he ever went back to Ivy City" would receive the impression, Reams argues, "that he provided 'false exculpatory information in the form of a doubtful alibi,'" quoting *Henderson,* 632 A.2d at 429, "an impression that could only be countered by Mr. Reams'[s] account of his whereabouts at the time of the shooting" (Br. for App. at 30).

■ Reams has preserved this argument, though only barely. At no place did he assert to the trial judge that his naked denial of having gone back to Ivy City would be viewed by the jury as a doubtful, because unexplained, alibi—in short, as a false exculpatory admission. Yet it seems to us apparent from the hearing on the admission of the statement that this argument would have fallen on deaf judicial ears, unlike the argument discussed previously. The trial judge was fully aware that allowing the government to introduce Reams's denial would have the incidental effect of placing his alibi, in skeletal form, before the jury ("[I]ndeed[,] if he says he didn't go back there, . . . period, you [defense counsel] already have the premise for an argument that he wasn't there on the day of the murder."); but the judge was unambiguous in ruling, nonetheless, that "portions of the statement that relate to the day of the homicide may not come in." To that extent, in other words, the judge had accepted the prosecutor's position that letting Reams introduce the details of the alibi would impermissibly (in the judge's words) be "trying to get him to testify without being subject to cross-examination." In this setting, we regard the present claim that admitting only a truncated version of Reams's denial of *ever*

having returned to Ivy City fostered a misleading impression as sufficiently preserved for review.

■ We accept further the assertion that Reams should have been allowed to present the details of his alibi to counter the possible impression that he had made only a bald, unadorned denial of guilt (*i.e.*, that he had never gone back to the neighborhood) without explanation. A teaching of *Henderson* and the authorities it cites is that, once the government in a criminal case has profited from portions of an out-of-court statement, " 'cumbersome definitions' and 'quibbling objections' " should not prevent the defense from putting " 'the whole of what was said at the same time on the same subject' " before the jury. *Henderson*, 632 A.2d at 427 (quoting 7 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2113, at 659 (James H. Chadbourn ed. 1978)); *see Butler v. United States*, 614 A.2d 875, 882 (D.C.1992) (completeness doctrine helps "secure for the tribunal a complete understanding of the total tenor and effect of the statement" (citations omitted)). The possibility of an adverse inference by the jury from Reams's unexplained denial that he had gone back to Ivy City—evidence the prosecution used partly as proof of motive—required the jury to hear his entire explanation under the completeness rule.

■ It is a different question, however, whether the danger that the jury would draw that inference without hearing Reams's alibi is realistic enough to warrant reversal of his convictions. Key to that inquiry are the centrality of the issue affected by the exclusion of the alibi, as well as the closeness of the case regarding his guilt. *See, e.g., Clark v. United States*, 593 A.2d 186, 193 (D.C.1991). The prejudice Reams claims, as pointed out, is that without learning of the rest of the statement the jury "might well have concluded from the thinness of his explanation for his whereabouts, that he offered the police false exculpatory information" (Br. for App. at 33). Important in this regard, however, is that at no place in the trial did the prosecutor attempt to exploit Reams's statement to the police for that purpose. Nowhere, that is, did the prosecutor suggest to the jury that the paucity of Reams's blanket denial was itself proof of his guilt as a false exculpatory admission. The lone remark Reams points to as such use was in the prosecutor's opening statement:

> Fight happens; Mr. Reams is gone. By his own words, never goes back. Actually, I'm getting a little ahead of myself because he did go back. Doesn't say he went back, but he did go back. We know he went back. Our evidence is going to convince you that he went back, and he went back on June 11th … with a gun.

As seems obvious, the prosecutor was asserting here that the government's *evidence* would show that Reams indeed went back—not that his "own words," because so impoverished an explanation of his whereabouts, proved that he had returned to do the shooting. The consistent theme of the prosecution at trial, driven home in its closing argument, was that the eyewitness testimony together with the motive evidence of the fight established Reams's guilt. His statement to the police was marginal evidence of that motive, and was not used at all to imply his guilt because of its difference from what "an innocent person would [have] likely provide[d] to the police … to account for his whereabouts" (Br. for App. at 29).

Moreover, the aggregate eyewitness testimony identifying Reams as the shooter was strong. Moments after bullets were

sprayed from a car killing Shaun Williams and wounding Donte Jenkins, Aiesha Jackson and Tanosha Harris saw Reams seated on the open window of a moving Taurus station wagon holding a handgun and leaning over the top of the car. Dawn Blake likewise heard the shots and saw Reams in the same position, though unable to see his hands as he tried to "scoot down" into the car. All three women knew Reams well from the neighborhood; at least two were friendly with him; all three had seen him in the station wagon on past occasions; and Harris (as well as Westley Ashe) had seen him in it earlier that day. None of the three women was claimed to have any motive to identify Reams falsely (defense counsel acknowledged in summation that "it is not the defense's contention ... that these people made up that [Reams] was the shooter"); and although each woman was impeached with one or more inconsistencies (Harris, for example, had initially mistaken Reams in the car for his brother),[3] the most the defense could suggest for why all three had placed Reams in the same tell-tale position was that they "were close ... [and] talked about it," and had ingested the fruits of the "rumor mill." And the same necessarily was true, the defense had to contend, of Wesley Ashe's testimony even though he had had no contact with the women since the shooting. Ashe too was unimpeached with any motive to accuse Reams falsely when he testified that he had watched him lean out of the Taurus and fire a handgun over the top of it at men running away. Although he could not see Reams's face, he recognized him from the back and side, especially from his distinctive back (one too long for "the average person"), as a young man he had been "around ... so long" ("1,001 times probably") and knew well.

■ Testimony by one or two of these witnesses, if that were all, might still leave us unable to say with reasonable assurance that the jury was not misled by hearing only Reams's unadorned denial that he had returned to Ivy City. Indeed, if that were all, Reams's alibi account of his whereabouts—before the jury, hearsay or not, under the completeness rule—might itself arguably have tipped the reasonable doubt balance even though Reams offered no testimony at all corroborating it. But that is not this case. Taken together, the testimony of four eyewitnesses confirming Reams's uniquely descriptive role as the shooter enables us to "say, with fair assurance, ... that the judgment was not substantially swayed" by the exclusion of other portions of Reams's police statement. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Indeed, even if we apply the constitutional test of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), because Reams was "denied the right to cross-examine the detective about the full statement ... taken from appellant," *Henderson,* 632 A.2d at 431–32 n. 36,[4] we reach the same result. The notion that all four eyewitnesses might have been disbelieved enough to create reasonable doubt on the strength of details of Reams's hearsay version of his whereabouts is too spec-

---

**3.** The parties stipulated that Reams's brother could not have been in the car because he was in Florida at the time.

**4.** In *Henderson* the court left open whether the Sixth Amendment is violated when erroneous application of the completeness doctrine prohibits the defendant from cross-examining a police witness about further portions of his statement to the police. 632 A.2d at 431–32 n. 36. The court applied the nonconstitutional standard of *Kotteakos* to "the trial judge's denial of defense requests for admission of omitted portions of appellant's audiotaped statement." *Id.* at 431.

ulative to support reversal.[5]

*Affirmed.*

---

[5.] We reject Reams's additional, unrelated claim that volunteered testimony by Donte Jenkins that he and Reams had sold drugs together required a mistrial. The trial judge struck the testimony and told the jury to disregard it because "[t]here is nothing in this case about selling drugs." As this court has said, "Not every admission of inadmissible ... evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. A defendant is entitled to a fair trial but not a perfect one." *Coleman v. United States*, 779 A.2d 297, 302 (D.C.2001) (citations and quotation marks omitted). In the present circumstances, the instruction by the trial judge was sufficient to neutralize any prejudice from the brief mention of drugs. *See, e.g., Smith v. United States*, 392 A.2d 990, 994 (D.C.1978).