**Patrick F. ANDREWS, Appellant,**

v.

**UNITED STATES, Appellee.**

**Randall C. Mack, Appellant,**

v.

**United States, Appellee.**

**Nos. 02–CF–1043, 02–CF–1048.**

District of Columbia Court of Appeals.

Argued March 14, 2007.

Decided May 3, 2007.

each household where Spanish is the primary     language").

 

Dennis M. Hart, Washington, DC, appointed by the court, for appellant Andrews.

Andrea Roth, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant Mack.

John P. Gidez, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, and Lisa H. Schertler, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and SCHWELB, Senior Judge.

SCHWELB, Senior Judge:

Patrick F. Andrews and Randall C. Mack were both convicted by a jury of first-degree premeditated murder while armed,[1] possession of a firearm during the commission of a crime of violence (PFCV),[2] and two counts each of three weapons offenses: carrying a pistol without a license (CPWOL),[3] possession of an unregis-

tered firearm (UF),[4] and possession of ammunition for an unregistered firearm (UA).[5] The charges against the two men arose from the shooting death of Deyon Rivers on July 7, 2000. On appeal, Andrews contends that the trial judge erred in denying his motion to suppress a loaded pistol recovered from an automobile allegedly owned by Andrews; that the evidence was insufficient as a matter of law to establish that he constructively possessed the pistol and ammunition at the time of their recovery by the police; and that his convictions for CPWOL, UF, and UA violate his individual right to bear arms, which right, he asserts, is protected by the Second Amendment. We are unpersuaded by these contentions and affirm all of Andrews' convictions.

Mack's sole contention on appeal is that the trial judge erred by admitting into evidence inculpatory parts of his statement to the police (in which Mack admitted that he possessed one of the loaded murder weapons on the day of his arrest, July 21, 2000), but excluding the exculpatory portion (in which Mack claimed that he had not received the pistol until two or three days before his arrest, and in which he thus denied that he possessed the weapon on July 7, 2000, the date of the decedent's murder). Mack contends that the exclusion of the portion of the statement which explained his possession of the murder weapon two weeks after the commission of the crime violated the "rule of completeness." *See, e.g., Henderson v. United States,* 632 A.2d 419, 424 (D.C.1993); *Reams v. United States,* 895 A.2d 914,

---

1. D.C.Code §§ 22–2401, –3202 (1981), recodified in D.C.Code §§ 22–2101, –4502 (2001).

2. D.C.Code § 22–3204(b) (1981), recodified in D.C.Code § 22–4504(b) (2001).

3. D.C.Code 22–3204(a) (1981), recodified in D.C.Code § 22–4504(a) (2001).

4. D.C.Code §§ 6–2311(a) (1981), recodified in D.C.Code § 7–2502.01(a) (2001).

5. D.C.Code § 6–2361(3) (1981), recodified in D.C.Code § 7–2506.01(3) (2001).

918–19 (D.C.2006); *Cox v. United States*, 898 A.2d 376, 381–82 (D.C.2006). The government acknowledges that the exclusion of the exculpatory portion was erroneous and contrary to our decisions in *Henderson, Reams,* and *Cox,* but it contends that the error was harmless. We conclude that the error was prejudicial, and we therefore reverse Mack's convictions for armed premeditated murder, PFCV, and the weapons offenses alleged to have been committed on July 7, 2000. We affirm Mack's convictions for the weapons offenses committed on July 21, 2000.

## I.

### THE EVIDENCE

A. *The murder of Deyon Rivers.*

The prosecution's theory at trial was that Andrews and Mack shot and killed the decedent, Deyon Rivers, in Rivers' car near the corner of 18th and C Streets, N.E. at approximately 2:25 a.m. on July 7, 2000. The shooting occurred in the wake of an altercation on the previous day between Rivers and David Braddy, who was a friend of both Andrews and Mack. Braddy had complained to Andrews and Mack that Rivers, who did not live in the neighborhood, but who was apparently keeping company with a young woman who did, had shot "bottle rockets," [6] one of which had almost hit Braddy's girlfriend. Braddy was angry about the incident,[7] but his girlfriend told him to "leave it alone," and the altercation ended without immediate violence.

At the time of the confrontation between Rivers and Braddy, the latter was in the company of Morris Jones, then fifteen years old. Jones, who suffered from a learning disability as well as low intellectual functioning and substance abuse, was a principal prosecution witness at the trial. He testified that at the time of the murder, he was on a "home visit" from a Pennsylvania institution for juvenile delinquents to which he had been committed following his involvement in several armed robberies. According to Jones, he and Braddy spoke with Andrews and Mack shortly after Braddy's encounter with Rivers, and Braddy told the two defendants what had occurred. Jones did not assert, however, that Braddy asked Andrews or Mack to harm Rivers.

Later in the evening, well after midnight, Jones and Braddy were sitting on the porch of Braddy's home, drinking and smoking marijuana. Jones acknowledged that while the two young men were engaged in this activity, he had consumed four or five cups of liquor and had shared a "dime bag" of marijuana with Braddy. According to Jones, Braddy received a telephone call and went into the house, leaving Jones alone on the porch. After Braddy's departure, Jones saw a car pull up to the corner of 18th and C Streets. He recognized the driver as the individual who had fired the "bottle rocket" near Braddy's girlfriend. At this point, according to Jones, Andrews and Mack, each of whom he knew well, came out of an alley and fired handguns multiple times into the vehicle. Jones further testified that he and Braddy encountered Andrews on the

---

**6.** A "bottle rocket" was described at trial as a kind of fire cracker.

**7.** According to prosecution witness Morris Jones, Braddy told Rivers that he had "better watch the bottle rockets." Rivers responded that Braddy should not "worry about it if it did not hit her." Later in the evening, Braddy allegedly stated that he wanted to kill the man who shot off the fire cracker. The shooting of the bottle rocket, and Rivers' response to Braddy's reproof, apparently cost Rivers his life.

following day and inquired about the events of the previous night. Andrews told them that he had seen "a suspicious car coming down the street," that he had become "paranoid or something like that," and that he had shot at the car.

Jones did not report the shooting to the police, but investigating officers apparently learned that he may have been a witness. On August 22, 2000, while Jones was on another "home visit" from the juvenile institution in Pennsylvania, the police brought him to the United States Attorney's Office for questioning. By this time, Andrews and Mack were the prime suspects, for the police had recovered the two pistols with which the decedent had been shot to death, and each weapon had been in the possession of one of the two defendants. Jones initially told the police that he knew nothing about the shooting, but after being questioned for approximately three hours, Jones identified Andrews and Mack as the shooters. He was immediately taken before the grand jury, where he repeated his identification of the defendants.

A second prosecution witness, Courtney Burley, was also a juvenile with a history of delinquency. Burley testified that on the night of the shooting, he saw Mack in a concealed position in an alley near 23rd and C Streets, N.E. Burley approached Mack, who told him that it was "about to get hot out there" because of "some gangster shit." Despite this warning of impending violence and danger, and although he lived only a short distance away, Burley called his brother to come and pick him up. His brother arrived approximately fifteen minutes later, and as they drove away, Burley heard the sound of shooting.

On the following day, Burley encountered Mack again in front of a store. In response to Burley's inquiry regarding what had occurred the previous night, Mack allegedly stated that he had been "shooting." Burley provided this information to the police on August 12, 2000, after he had been arrested on a custody order for violation of the conditions of his probation. He originally denied, but subsequently admitted, that he hoped to receive lenient treatment in return for his cooperation. Burley was also impeached, *inter alia*, with statements he made to the police to the effect that the fireworks incident occurred several days before the shooting.

Andrews presented alibi evidence, principally from his former girlfriend.[8] Mack presented the testimony of James Braddy, David Braddy's father. According to James Braddy, he, his wife, and his son were inside the house watching television for a "couple of hours" prior to the shooting. When he heard shots, James Braddy went to the porch to investigate, and Morris Jones was not there. Indeed, Mr. Braddy had not seen Jones anywhere, either that night or on the previous day. Mr. Braddy confirmed that his son had been involved in an incident relating to fireworks.

### B. The recovery of the Glock 17 from Andrews' Cadillac.

On July 21, 2000, at approximately 11:00 a.m., Officer Michael Dean of the Metropolitan Police Department observed an unoccupied burgundy-colored Cadillac in the 300 block of 17th Place, N.E., with an expired rear paper license tag. There was no corresponding license tag on the front of the car, but a crumpled paper tag was inside the vehicle, near the right side of the windshield. Officer Dean opened the door of the Cadillac, (which, remarkably,

---

8. The girlfriend did not recall the precise date that Andrews was allegedly with her, but another witness identified that date as being the date of the murder.

was unlocked) for the purpose, *inter alia*, of checking the tag against the VIN number. Inside the vehicle, he observed, in plain view, a black ammunition magazine protruding beneath the driver's seat. Dean called for Crime Scene Search Officers, and police subsequently recovered a Glock 17 semi-automatic pistol loaded with a single round of ammunition, as well as a clip containing 26 rounds.

Inside the car, the police found a number of items linking it to Andrews. These items included (1) a vial of prescription medicine in Andrews' name; (2) an envelope addressed to Andrews; (3) several traffic citations for moving violations, all issued to Andrews; and (4) an empty bottle of Vodka with Andrews' right palm print on it. The registration was in the name of Deon Long. Ms. Long, who was the girlfriend of a friend of Andrews, testified at the trial that in June of 2000, Andrews had asked her to "sign for" a loan for a car that Andrews wanted to buy. Andrews promised to make the monthly payments. Ms. Long signed the paperwork, and Andrews took possession of the vehicle.

An MPD firearms examiner testified that fourteen of the sixteen cartridges recovered near the decedent's body on June 7, 2000, were fired from the Glock 17 pistol recovered from the burgundy-colored Cadillac.

C. *The recovery of the Bryco possessed by Mack.*

On July 21, 2000—the date on which the Glock 17 was recovered from Andrews'

Cadillac—officers were in the area of 18th and D Streets, N.E., investigating the murder of Deyon Rivers and interviewing potential witnesses. Detective Michael Irving saw a man, later identified as appellant Randall C. Mack, who "looked like the individual we were looking for."[9] Irving directed Mack, who appeared to be reaching for a pistol in his waistband, to "stop for a second." Instead of stopping, however, Mack ran away. Irving and other officers pursued Mack, and they found him hiding behind a large trash can. Along the path of Mack's flight, the officers recovered a Bryco semi-automatic pistol. The MPD ballistics expert testified that two of the sixteen cartridges recovered from the scene of the murder were fired from the Bryco pistol which Mack had dropped while fleeing from the police.

D. *Mack's Statement.*

Following his apprehension, Mack gave the police a 38–page statement in which he admitted that he was in possession of the Bryco pistol but denied any involvement in the murder. Mack told the officers that he had received the pistol from Andrews two or three days before he (Mack) was apprehended by the police. The government sought to introduce into evidence only that portion of the statement in which Mack admitted his possession of the Bryco on July 21, 2000. Mack's attorney contended that, under the rule of completeness, the jury should also learn of Mack's claim that he had possessed the pistol only for a couple of days. The trial judge agreed with the prosecution.

---

**9.** The record does not disclose the source of the description that Mack allegedly matched. Mitchell Battle, an animal control officer, testified that he saw a man running in an alley in the area of the murder, and he then observed Rivers' vehicle with the windows shot out and his body slumped over, one foot hanging out of the door. Officer Battle described the running man as being about 5'9" tall and weighing about 150 pounds. A police detective, called as a defense witness, testified that in July 2000, Mack was six feet tall and weighed 203 pounds.

The portion of Mack's statement which the trial judge admitted into evidence reads, in pertinent part, as follows:

Detective Owens: Okay. Now let's talk about what happened today, okay, around 18th and D. Do you remember?

Mack: Yes.

Owens: Okay, now, the police were in the area and then you had come to the corner of 18th and D?

Mack: Yes.

Owens: You know, wearing the same clothing you're wearing now. And tell us what happened?

[redacted]

Owens: Okay, so you had a gun with you?

Mack: Yes.

Owens: Okay, where was the gun?

Mack: The gun was on me.

Owens: Okay, show me where exactly on your body?

Mack: It was right here (indicating).

Owens: Okay, stuck in the waistband of your pants?

Mack: Yeah.

Owens: Okay, and it was under your shirt?

Mack: Yes.

Owens: Okay, go ahead.

Mack: [redacted] And I seen—I seen—this other boy I was talking to. Then when we finished talking, the police—you know what I'm saying?—The police came towards me and said, "come here, come here, come here." And I ran. And they chased me. And I threw the gun and I was hiding. I was hiding from the police. Then I just—gave myself up.

The part of the statement which Mack ultimately sought to introduce into evidence, but which the trial judge excluded, was as follows:

Owens: Okay. Now, how did you come in possession of this gun you threw in the yard today?

Mack: I got it—the gun from Patrick [Andrews].

Owens: So how did you happen to get the gun from Patrick?

Mack: He gave it to me. He told me hold it—hold the gun from him—for him. He said it was hot.

Owens: Do you remember when he gave it to you?

Mack: It was two days ago—two days—yeah, two days ago before I got the gun-two or three days ago before I got the gun.

Owens: Now, you're talking about two days or three days from today?

Mack: Yeah.[10]

## II.

## ANDREWS' APPEAL

■ Andrews presents three contentions for our consideration, but we discern no merit in any of them. Only one of his claims, namely, that the District's gun control statutes deny him rights protected by the Second Amendment, requires more than summary discussion.

In *Sandidge v. United States*, 520 A.2d 1057 (D.C.), *cert. denied*, 484 U.S. 868, 108 S.Ct. 193, 98 L.Ed.2d 145 (1987), this court

---

10. Mack's attorney initially sought to introduce only the third question and answer in the passage quoted above, but he indicated that he might wish to revisit the issue. In a written motion for reconsideration after the judge had ruled against him, counsel asked that the jury be provided with all four of the questions and answers recited in the text. Under all of the circumstances, we conclude that Mack's claim has been adequately preserved as to all four questions and answers.

rejected the very claim here being asserted by Andrews, as follows:

> We agree with numerous other courts that "the Second Amendment guarantees a collective rather than an individual right." *United States v. Warin*, 530 F.2d 103, 106 (6th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976); *accord Stevens v. United States*, 440 F.2d 144, 149 (6th Cir.1971); *United States v. Kozerski*, 518 F.Supp. 1082, 1090 (D.N.H.1981), *aff'd mem.*, 740 F.2d 952 (1st Cir.), *cert. denied*, 469 U.S. 842, 105 S.Ct. 147, 83 L.Ed.2d 86 (1984); Annot. 37 A.L.R. Fed. 696, 706 (1978) (citing cases). That is to say, it protects a state's right to raise and regulate a militia by prohibiting Congress from enacting legislation that will interfere with that right. The Second Amendment says nothing that would prohibit a state (or the legislature for the District of Columbia) from restricting the use or possession of weapons in derogation of the government's own right to enroll a body of militiamen "bearing arms supplied by themselves" as in bygone days. *United States v. Miller*, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). In sum, "[t]he right to keep and bear arms is not a right conferred upon the people by the federal constitution. Whatever rights the people may have depend upon local legislation...." *Cases v. United States*, 131 F.2d 916, 921 (1st Cir.1942), *cert. denied*, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718 (1943).

*Id.* at 1058.

■ The decision in *Sandidge* is binding on us as a division of this court. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). As we recently stated in *Bennett v. United States*, 876 A.2d 623 (D.C.2005), a case in which we considered a Second Amendment claim similar to the one now before us, "appellant can not prevail because his challenges are foreclosed by this court's binding precedents." *Id.* at 636 (citing *inter alia*, our decisions in *Sandidge* and in *M.A.P. v. Ryan*). We explained that under the rule of *M.A.P. v. Ryan*, "[n]o division of the court may overrule another division; only the *en banc* court can accomplish this result." *Bennett*, 876 A.2d at 636 n. 13; *accord, Austin v. United States*, 847 A.2d 391 392–93 (D.C.) (per curiam), *cert. denied*, 543 U.S. 895, 125 S.Ct. 185, 160 L.Ed.2d 161 (2004).

■ Andrews cites *Parker v. District of Columbia*, 375 U.S.App. D.C. 140, 478 F.3d 370 (2007), *pet. for rehearing en banc filed* 4/9/07, in which the court held that the Second Amendment protects an individual right to bear arms.[11] We are, however, precluded by *Sandidge* and by *M.A.P. v. Ryan*[12] from following the decision in *Parker*. Moreover, the court in *Parker* explicitly noted that the issue before it was whether the Second Amendment protects the individual right to bear arms within a citizen's home, "so we need not consider the more difficult issue whether the District can ban the carrying of handguns in public, or in automobiles." *Parker*, 478 F.3d at 370. Andrews carried a pistol in public (on July 7, 2000, when he shot the decedent) and in an automobile (on or about July 21, when the Glock 17 was recovered from the Cadillac). Accordingly, even if we were not precluded by

---

11. According to the court in *Parker,* the "[f]ederal appellate courts have [also] largely adopted the collective right model," as have ten of seventeen of the state appellate courts that have addressed the issue. 478 F.3d at 380.

12. We held in *M.A.P. v. Ryan* that this court is bound by decisions of the United States Court of Appeals for this Circuit issued prior to February 1, 1971, but not by those issued thereafter. 285 A.2d at 312.

*Sandidge* and *M.A.P. v. Ryan* from construing the Second Amendment as Andrews ask us to interpret it, the *Parker* decision would not be dispositive in Andrews' favor.[13]

## III.

## MACK'S APPEAL

A. *Background and applicable legal standard.*

As previously noted, the trial judge declined to admit into evidence, under the rule of completeness, the portion of Mack's statement to the police in which Mack claimed to have received the Bryco two or three days before his arrest, and thus approximately twelve days after this pistol was used in the murder of Deyon Rivers. On appeal, Mack contends that the redacted version of the statement received in evidence by the court, especially when considered together with statements made by the prosecutor during closing argument, conveyed the false impression that Mack had confessed that the Bryco was "my gun" and that he had not denied possessing the weapon on the day of the murder.

Mack claims that the trial judge's ruling was contrary to the rule of completeness and denied him a fair trial. Although the government disputes some of Mack's contentions, it concedes in its brief that "Mack's statement that he got the gun two [or three] days before the police stopped him should have been admitted under the rule of completeness and this [c]ourt's precedents of *Henderson, Reams,* and *Cox*." (Citations omitted.) In light of the government's concession, which we deem to be a provident one, the only issue that we must decide is whether the error was prejudicial or harmless.

■ Our precedents are not entirely clear whether, in determining the error was prejudicial or harmless, we should look to the non-constitutional standard of *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) or the constitutional "harmless beyond a reasonable doubt" standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Compare Cox,* 898 A.2d at 382; *Henderson,* 632 A.2d at 431; and *United States v. Sutton,* 255 U.S.App.

---

13. The presence of Andrews' Cadillac parked on a public street without current identification tags in the front and rear of the vehicle was contrary to the District's traffic regulations. *See* 18 DCMR §§ 422.1, 422.4 (1995). An unattended vehicle parked in violation of any traffic regulation may be impounded and towed. *18 DCMR § 2421.1 (1995).* If Officer Dean had the right to tow and impound the vehicle, then he necessarily had the right to enter it. Dean therefore acted lawfully in opening the unlocked car door in preparation for impoundment and towing. *See State v. Geissler,* 134 Idaho 902, 11 P.3d 1120, 1124 (2000) (holding that the opening of the door of a car to check the VIN did not rise to the level of a constitutionally prohibited search); *see also New York v. Class,* 475 U.S. 106, 118, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) ("the governmental interest in highway safety served by obtaining the VIN is of the first order"). Once Officer Dean saw the ammuni-

tion clip in plain view, the police had probable cause to seize and search the vehicle.

Turning to Andrews' claim that the evidence was insufficient to prove beyond a reasonable doubt that he constructively possessed the pistol recovered from the Cadillac, we must view the record in the light most favorable to the prosecution and draw every reasonable inference in the government's favor; questions of credibility are for the jury. *See, e.g., Rivas v. United States,* 783 A.2d 125, 134 (D.C.2001) (en banc). In light of the testimony that the Cadillac was purchased for Andrews, the presence in it of various items belonging to him, his identification by Jones as one of the shooters on July 7, 2000, his alleged admission to Jones and Braddy on the day after the shooting, and the ballistics evidence that the Glock 17 was one of the murder weapons, the evidence was sufficient to support the jury's verdict.

D.C. 307, 331, 801 F.2d 1346, 1370 (1986) (applying *Kotteakos* ), *with Henderson,* 632 A.2d at 432 n. 36 and *Reams,* 895 A.2d at 923 (both suggesting that curtailment of the defendant's right to cross-examine the officer regarding the exculpatory portion of the declarant's statement may implicate *Chapman* ).[14] We need not decide whether *Kotteakos* or *Chapman* governs this appeal because, assuming, *arguendo,* that the *Kotteakos* standard applies, we are unable to say "with fair assurance, after pondering all that happened, without stripping away the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239. "To conclude that an error is harmless [under *Kotteakos*], we must find it *highly probable* that that error did not contribute to the verdict." *Wilson–Bey v. United States,* 903 A.2d 818, 844 (D.C.2006) (en banc) (emphasis in original; citations, internal quotation marks and internal brackets omitted). Although the case against Mack was by no means a weak or marginal one, we conclude that the government has not satisfied the "reasonable assurance" standard of *Kotteakos* or shown the "high[ ] probab[ility]" required by *Wilson–Bey.*

B. *The rule of completeness.*

■■■■ "Under the rule of completeness, a party is entitled, once a part of a document or recorded statement has been introduced into evidence, to seek admission of the remainder of the statement." *Henderson,* 632 A.2d at 424 (citations omitted). The rule has its origin in "a concern that if only a part of a statement is introduced, the statement may be unfairly removed from its context." *Id.* at 425 (citations omitted).[15] More specifically, as we explained in *Henderson,*

> the principle underlying the rule of completeness is fairness. When properly invoked the rule is designed "to secure for the tribunal a complete understanding of the total tenor and effect of the utterance[s]."

*Id.* at 426 (quoting 7 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2113, at 653 (James H. Chadbourn ed. 1978) (other citations omitted)).

■■■■ Further, in criminal cases, the fairness concerns that gave rise to the rule of completeness are

> amplified by constitutional considerations. The rule of completeness must be applied to ensure that a defendant is not forced to choose between allowing his or her statement to stand distorted as a result of selective introduction and abandoning his or her Fifth Amendment right not to testify in order to clarify that statement.

*Id.* Thus, the prosecution may not introduce a portion of a defendant's statement to the police if that portion fails to convey the "thrust" of the whole statement, *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), or does not give the jury "a complete understanding of the total tenor and effect" of the statement. *Henderson,* 632 A.2d at 426. The rule however, is not absolute; its applicability in criminal cases

---

14. Because we conclude that the error was prejudicial under *Kotteakos,* reversal would be required *a fortiori* if we were to apply the *Chapman* standard. Accordingly, our assumption, *arguendo,* that the harmless error inquiry is governed by *Kotteakos* rather than by *Chapman* does not affect the outcome of Mack's appeal.

15. The importance of context is illustrated by the following celebrated example: "[I]f a person is charged with saying 'There is no God,' he appeals to the preceding clause, 'The fool has said in his heart.' " *Henderson,* 632 A.2d at 425 (quoting JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2113, at 659–60 (James H. Chadbourn ed. 1978)).

is limited to situations in which "the prosecution introduces only the inculpatory portions of a statement made by the defendant," *id.*, or "excludes information substantially exculpatory of the declarant." *Butler v. United States*, 614 A.2d 875, 882 (D.C.1992) (citations and internal quotation marks omitted); *see also Cox*, 898 A.2d at 381. Finally, "cumbersome definitions and quibbling objections should not prevent the defense from putting the whole of what was said at the same time on the same subject before the jury." *Reams*, 895 A.2d at 922 (quoting *Henderson*, 632 A.2d at 427) (other citations and internal quotation marks omitted).

The present appeal illustrates how the rule of completeness promotes the interests of justice in a criminal case. By failing to apply the rule, the trial judge enabled the jury to hear extremely damaging evidence that Mack possessed one of the murder weapons on July 21, but she excluded evidence which, if credited, would have shown that he did *not* possess it on the day that Rivers was murdered. After viewing Mack's statement in its redacted form, the jurors knew that Mack had spoken to the homicide detectives about his relationship to the murder weapon, but they were not apprised of the fact that Mack had provided an innocent (as to the murder) explanation of his possession of it. As Mack persuasively argues in his brief,

> Mr. Mack's apparent failure to deny complicity in the murder and provide an innocent explanation for his possession of the murder weapon in circumstances where an innocent man would have been expected to provide such an explanation strongly indicated to the jury Mr. Mack's guilt through his own admission. But the truth of the matter is that Mr. Mack *did* deny the gun was his, denied complicity in the murder, and essentially explained to the homicide detectives that

although it may have looked incriminating that he had a "hot" gun, he had only recently received it from another man, twelve days after the shooting, a timeframe that, if established made it impossible for him to have been one of the shooters.

Further, as previously noted, the government agrees that the admission of the statement as edited cannot be reconciled with the rule of completeness as enunciated in *Henderson*, *Reams*, and *Cox*.

### C. Harmless error analysis.

In determining whether the trial court's error was prejudicial or harmless, we consider (1) "the centrality of the issue affected by the error"; (2) "the closeness of the case"; and (3) "the steps taken to mitigate the effects of the error." *Allen v. United States*, 837 A.2d 917, 921 (D.C. 2003) (citations and internal quotation marks omitted). In the present case, no mitigating measures were taken, and our decision must therefore turn on the first two factors identified above. We consider each in turn.

#### 1. The centrality of the error.

The case against Mack consisted, essentially, of (1) his identification by Jones as one of the shooters; (2) Burley's testimony regarding his encounters with Mack on the night of the shooting and on the following day; (3) Mack's possession of the Bryco shortly before his arrest; and (4) Mack's videotaped statement to the police. In its redacted form, Mack's statement was an unqualified confession that he possessed one of the murder weapons on July 21, unaccompanied by any explanation of how he obtained it or any denial of complicity in the murder. Although Mack did not admit, in his statement to the police, that he was involved in the murder of the decedent, the existence of the redacted state-

ment enabled the government to use Mack's possession of the Bryco on July 21 as persuasive evidence that he was one of the murderers. The prosecutor even asserted, albeit inaccurately, both in his opening statement and in rebuttal argument, that Mack had referred to the murder weapon as "my gun." [16] Mack's redacted statement to the police was thus, at least, a major part of the case for the prosecution.

■ Indeed, it is fair to state that the prosecutor attributed great significance to the admissions in Mack's redacted statement during his opening remarks to the jury and in his closing and rebuttal arguments.[17] When the government was presenting its case, a police detective described in some detail the circumstances under which Mack gave the statement, without ever mentioning Mack's version of the manner and timing of his acquisition of the pistol. A prosecutor's repeated highlighting, during the course of the trial, of an erroneously admitted statement is persuasive evidence of its centrality and prejudicial character. *See Hill v. United States*, 858 A.2d 435, 448–49 (D.C.2004).

Moreover, the government's assertion on appeal that the improper redaction of Mack's statement probably did not affect the jury's verdict is difficult to reconcile with the prosecution's argument to the judge at trial. Claiming that the jury should not be apprised of Mack's claim that he received the pistol only two or three days before his arrest, the prosecutor asserted that

> everything beyond the simple affirmation that he had the gun on the day he was arrested ... is *really exculpatory*. It is *unduly prejudicial*. ... I think those kind[s] of self-serving exculpatory and we believe untrue assertions by Mr. Mack really are *prejudicial to the government's case*.

(Emphasis added.) The judge agreed with the prosecutor's argument and excluded the questions and answers that Mack's counsel sought to bring to the jury's attention.

If *the admission* of the contested parts of Mack's statement would have been substantially prejudicial to the government, as the prosecutor insisted, then it is difficult to understand why *the exclusion* of the same evidence was not similarly and un-

---

**16.** In fact, Mack denied that the pistol was his. Indeed, Mack's unredacted statement reveals that Mack did not regard the pistol as "my gun" at all. Rather, he claimed that he had been holding the weapon for Andrews for a few days at the latter's request because it was "hot."

Since the exculpatory portion of the statement (referring to Mack's recent acquisition of the pistol) had been excluded and kept from the jury, the government used Mack's statement, without objection, if not as a confession of the murder, then at least as almost equivalent to a confession. Mack's possession of "my" gun, which was one of the murder weapons, was totally unexplained by him. If as the truncated record indicated, (1) the Bryco was used to kill Rivers, (2) Mack was in possession of the pistol two weeks later, and (3) he provided no explanation, the

inference that Mack was one of the shooters on July 7 was not a difficult one for an impartial juror to draw.

**17.** In his rebuttal argument, the prosecutor explicitly told the jury that Mack had described the Bryco as "my gun." He emphasized that this admission was made in a formal videotaped statement after Mack had waived his constitutional right to remain silent and had agreed to tell the detectives about his relation to the pistol. The prosecutor stated that, after being arrested,

> Mack was taken back to the police station and read his rights. He agree to give a statement. He goes on videotape and says: "*Yeah, that's my gun that I tossed as I was running.*" The other murder weapon.

(Emphasis added.)

fairly prejudicial to the defense. Indeed, the prosecutor's representation to the trial court that the exculpatory portions of the statement would unfairly undermine the government's case is a powerful indication of the "centrality—at least in the prosecutor's mind—of the error." *Allen*, 837 A.2d at 923. Moreover, "[a prosecutor's] own estimate of his case, and of its reception by the jury at the time, is, if not the only, at least a highly relevant measure now of the likelihood of prejudice." *Garris v. United States*, 129 U.S.App.D.C. 96, 100, 390 F.2d 862, 866 (1968); *Allen*, 837 A.2d at 923. To paraphrase the opinion of the United States Court of Appeals in *United States v. DeLoach*, 164 U.S.App.D.C.116, 504 F.2d 185 (1974), "if [the exculpatory portion of Mack's statement] had really been unimportant, the prosecutor would not, we think, have objected to [it] so strenuously." 164 U.S.App.D.C. at 122, 504 F.2d at 191.

The government's claim at trial that the admission of the exculpatory questions and answers in Mack's statement would be unfair and prejudicial was not entirely unreasonable. As the prosecutor pointed out, the government would have no opportunity to cross-examine Mack, who chose not to testify, with respect to Mack's assertion that he did not receive the Bryco pistol until approximately twelve days after the murder. Moreover, as the trial judge explained in excluding the contested parts of Mack's statement, the redacted version of that statement did not amount to a confession of guilt of the murder:

> The government is free to argue [that] the fact that [Mack] had the gun on July 21 is circumstantial evidence that he had it on July 7. And on the other hand, [Mack] is free to argue that the fact that he had it on July 21 does not mean that

he had it on July 7.[18] Indeed, the defense questioned several jurors during *voir dire* about the connection and each juror questioned indicated that he or she understood that possession of the gun on July 21 did not mean possession of the firearm on July 7.

Moreover, an impartial juror could reasonably be expected to infer from the redacted statement that Mack did not confess participation in the murder, for if he had confessed, then that confession would surely have been brought to the jury's attention.

Thus, in our view, the claim in Mack's reply brief that "[t]he government chose to exploit the unfairly redacted version of the statement to make its point that *Mack essentially confessed to having the murder weapon on the day of the murder*" (emphasis added), overstates the effect of the trial court's ruling. Nevertheless, the impermissible redaction of the statement went to a major piece of evidence. The importance of that evidence—*i.e.*, of the statement without its exculpatory portion—was emphasized by the prosecutor when the issue arose in the trial court. In our view, therefore, the trial court's failure to apply the rule of completeness had substantial, if not overwhelming, centrality, and it was significantly prejudicial to Mack's defense.

### 2. The strength of the government's case.

Turning now to the second factor to be considered in the harmless error calculus—the *strength of the government's case*—we begin by noting the obvious: the prosecution's evidence against Mack was by no means insubstantial. The government's principal witness, Jones, who

---

**18.** Although it is true that Mack's counsel was free to make this argument, however, the judge's ruling deprived him of any evidence to back up his claim that he did not possess the pistol on July 7.

claimed to have seen the murder, testified that he observed Andrews and Mack, both of whom he knew personally, shoot at the decedent. Two weeks after the murder, each of the defendants was in possession of one of the murder weapons. "Coincidences happen, but an explanation not predicated on happenstance is often the one that has the ring of truth." *In re Brian O. Godette*, 919 A.2d 1157, 1166, No. 05–BG–412, 2007 D.C.App. LEXIS 156 (D.C. 2007) (quoting *Burwell v. United States*, 901 A.2d 763, 770 (D.C.2006)).

Even if the identification by Jones, bolstered by Burley's testimony regarding his encounters with Mack on the night of the murder and on the following morning, are deemed to be of dubious reliability, the believability of these witnesses is significantly enhanced by the discovery that each of the defendants was in possession of one of the murder weapons two weeks after the commission of the crime. Conversely, even assuming, *arguendo*, that handguns are rapidly passed around in the criminal sub-culture, and that possession of the Glock or the Bryco on July 21 is of limited probative value as to who possessed either weapon two weeks earlier, the inference to be drawn from such possession is undoubtedly reinforced when an eyewitness identifies both July 21 possessors as July 7 shooters. Moreover, Jones' accurate identification of Andrews, and Burley's report of Mack's activities, provided further corroboration of Jones' testimony that Mack was one of the murderers.

Nevertheless, at least without Mack's unexplained possession of the Bryco on July 21, the government's case against Mack was burdened by significant difficulties. Morris Jones was fifteen years old when he claimed to have witnessed the murders. Notwithstanding his tender years, he was already heavily involved in criminal activity, including several armed robberies and the abuse of illegal drugs. He was a retarded youngster of limited intelligence. Under these circumstances, common sense tells us that when Jones was brought to the United States Attorney's Office in August 2000, he was, in all probability, a highly suggestible witness. Already in a heap of trouble, Jones was hardly in a position to do anything to defy the police or to act in a manner that was likely to displease the officers or the prosecutors.

Prior to their interview with Jones, the police had already made substantial progress in their investigation of the murder of Deyon Rivers, and their efforts had borne fruit. One of the murder weapons had been found in Andrews' Cadillac. The other had been dropped by Mack while running from the police. In denying his own guilt in his statement to the police, Mack implicated Andrews. Thus, when Morris Jones was brought to the United States Attorney's Office, the police already had their prime suspects—Andrews and Mack.

The reliability of Jones' identification of Mack as one of the shooters must be evaluated with this sequence of events in mind. There is no evidence in the record, and we certainly do not suggest, that the police coerced or put improper pressure on Jones (or on Burley) or induced either of them to lie. Nevertheless, the detectives had a viable theory of the murder, based on the recovery of the two pistols. Obviously, this viable theory would be even more viable if Jones identified Andrews and Mack as the two shooters. Indeed, identification of the two men as participants in the crime would plainly have been helpful to, and welcomed by, the police. It is therefore a reasonable inference that Jones—intellectually limited, but no doubt somewhat street-wise—grasped what it

was that the police wanted the truth to be and what they wanted him to say.

Jones admitted that at the outset of the questioning, he stated that he did not know anything about the murder. He also acknowledged that during the three-hour interview, he did not feel free to leave. At the end of the three hours—certainly not an unreasonable time, given the seriousness of the subject under discussion, but a significant time nevertheless—Jones had incriminated Mack and Andrews, thus implicitly conceding that his initial version— that he knew nothing about the murder— was a lie. An impartial trier of fact might well wonder which time Jones was lying, and whether he switched to the second version (incriminating the two defendants) because that was the one that he thought that the officers wanted to hear.

Serious doubt was also cast upon Jones' account by the testimony of James Braddy, the father of the young man whose hostile encounter with the decedent is said to have precipitated the murder. Mr. Braddy's testimony is difficult, if not impossible, to reconcile with Jones' account. According to Mr. Braddy, he, his wife, and his son David had been inside the house for a substantial period of time before the shooting. David Braddy could not simultaneously have been inside the house (with his parents) and on the porch (with Jones). Moreover, when James Braddy went out to the porch immediately after hearing gunfire, nobody was there. Indeed, Mr. Braddy, who was acquainted with Morris Jones, had not seen the boy that night or

during the preceding day. Mr. Braddy was not impeached, and he appeared to be an impartial witness. If he had a motive to protect anyone, it was his son, David, who was arguably the most logical suspect, for it was David Braddy, not Andrews or Mack, who had a dispute with the decedent.

The government claims that Mack had an ample motive to commit the murder, but this contention is questionable at best. Mack's motive was generated, according to the government, by the firecracker incident involving Rivers and David Braddy. Apparently, the government contends that Mack (and Andrews) killed the decedent because he had shot a "bottle rocket" which had almost hit Braddy's girlfriend, but which had missed. It is true that life can be cheap on the streets of our city, and that people are sometimes murdered in the District for very trivial reasons. Nevertheless, an incident with a firecracker which could have struck, but did not strike, *someone else's* girlfriend is, to put it in the vernacular, "something of a stretch."

\* \* \*

The question whether the trial court error in this case was prejudicial or harmless is not an easy one. As we have noted, the error was a significant one. Its importance to the government's case, though not overwhelming, was substantial. On the surface, the prosecution's evidence against Mack was strong, but upon closer examination, that case had significant weaknesses as well.[19] All told, we have no "reason-

---

**19.** Burley's testimony that he saw Mack in the alley on the night of the murder, and that Mack made a potentially incriminating statement on the following day, provided a measure of corroboration of the government's case. However, Burley, a juvenile with a record of delinquency, did not provide information to the police about the murder until August 12, 2000, when he was arrested on a

custody order relating to drug and weapons charges and violation of probation. His arrest came three weeks after the recovery of the murder weapons had made Andrews and Mack the prime suspects. After initially hedging, Burley acknowledged hoping that the charges against him would be dropped in exchange for his cooperation with the police, and he testified that he was well aware that

able assurance," as required by *Kotteakos*, that the ruling did not substantially affect the verdict. Accordingly, we conclude that Mack is entitled to a new trial with respect to the charges relating to events that occurred on July 7, 2000, including the armed murder of Deyon Rivers.

to have been committed on July 7, 2000 are reversed, and the case against Mack is remanded for a new trial. Mack's convictions for offenses committed on July 21, 2000 are affirmed. All of Andrews' convictions are affirmed.

*So ordered.*

## IV.

### CONCLUSION

For the foregoing reasons, Mack's convictions of armed premeditated murder, PFCV, and the weapons offenses alleged

---

Mack had been arrested for the murder. Like Jones, Burley had ample motivation to please the police by incriminating Mack. There were also various other discrepancies in Burley's testimony and, although none of them was major, the jury may well have regarded him as a less than reliable witness if Mack's improperly redacted statement, which strongly implied that Mack was guilty, had not been admitted into evidence.